18　213
28　498
29　508

[No. 3436.]

## C. R. Thomas *v.* The State.

1. INDICTMENT — PRACTICE.— One of the requisites of an indictment, as prescribed by article 420, Code of Criminal Procedure, is that "it must appear therefrom that the same was presented in the district court of the county where the grand jury is in session." This requirement is not complied with by recitals that the grand jurors were "in and for the county of F.," . . . "duly elected, tried, impaneled, sworn and charged in the district court of said F. county," . . . "to inquire into and true presentment make of all offenses committed within the county of F." Exception to an indictment upon this ground is an exception to the form of the indictment, and not to its substance, and the defect may be cured by amendment; but unless all the requirements prescribed by the statute for the form or the substance of an indictment are complied with, the indictment is subject to exception.

2. FORGERY — INDICTMENT.— Describing the written instrument charged to be forged, the indictment alleged that "it is in substance and effect as follows, to wit." *Held,* that this allegation imports that the instrument is set out by its substance and effect only, and not by its tenor and *in hæc verba,* as is necessary in an indictment for forgery when the instrument is accessible to the pleader. This defect in the indictment is one of substance, and fatal to its validity, as such defects cannot be cured by amendment.

3. SAME.— Indictment for forgery described the forged instrument as a "school voucher *or* check." *Held,* that this alternative designation of the instrument does not vitiate the indictment for uncertainty, inasmuch as it suffi-

ciently appears that both designations relate to the same instrument and mean the same thing.

4. SAME.— Indictment for the forgery of a "school voucher or check" alleged that the voucher or check purported to be signed by three persons designated by their names, and that it purported to be their act "as trustees for Bethlehem School Community No. 51." *Held* a sufficient allegation that the three designated persons were trustees, etc., and that the voucher or check purported to be their official act as such.

5. SAME — VARIANCE.— If a written instrument be set out according to its tenor or *in hæc verba*, a variance (otherwise than by misspelling) between the words of the instrument as set out and those of the instrument put in evidence is fatal to the prosecution.

6. EXPERT EVIDENCE.— In a trial for forgery an expert witness was permitted, over objection by the defense, to make a fac-simile of one of the signatures in question, and the fac-simile and a genuine signature were, over objection as aforesaid, exhibited to the jurors,— the purpose being to show how easily the genuine signature could be counterfeited. *Held*, that this evidence was erroneously admitted, because, however easy it may have been for the expert to imitate the signature, it had no tendency to prove that the defendant either did or could imitate it. Such proof as this was obviously calculated to prejudice the rights of the defendant, and its admission was material and reversible error.

7. EVIDENCE — GENERAL CHARACTER OF WITNESS FOR TRUTH.— To impeach the testimony of a witness for the defense the State adduced proof that he had made statements out of court contradictory of his testimony, and the defense, for the purpose of supporting his evidence, proposed to prove that his character for truth and veracity was good where he lived. The trial court excluded the proposed proof. *Held*, error.

APPEAL from the District Court of Freestone. Tried below before the Hon. L. D. Bradley.

The conviction in this case was for the forgery of a school voucher or check, in Freestone county, Texas, on the 5th day of September, 1882. The penalty imposed by the jury was a term of seven years in the penitentiary.

County Judge O. C. Kirven was the first witness for the State. He testified that he had held his present position for the last eight years. He knew the defendant and pointed him out in court. Witness recognized the check exhibited by the indorsement on the same, made by the witness. This check was presented to the witness by the defendant, and was sworn to by him before the witness. This was in Freestone county, Texas, and on the 5th day of September, 1882, as appears from the witness's indorsement and certificate on the same. It was the opinion of the witness that the writing in the body of the instrument was the handwriting of the defendant, and so, in the opinion of the witness, are the names of Stepney Nickels and Booker Stein. The first name or signature to the check looks

like the usual signature of Dave Syrus, as he signed other checks of the like character.

Cross-examined, the witness testified that the trustees of Bethlehem School Community, at the time the check was drawn and presented, were Dave Syrus and Booker King. Witness would call the first name as it appears on the check Daev or Dalv Silsos or Silros. There was no such person in the community, nor was Booker Stein a trustee. It required the signatures of two trustees to make a check good. Witness had seen much of Dave Syrus's writing, and it is not always alike. He signs his name mechanically, or as one would draw a bird, and a very poor bird at that. Witness thought he was familiar with Dave's handwriting, and was of opinion that the name "Daev Silsos" was written by him, Dave Syrus. The check, as originally written and presented to witness, called for $35, and was changed by witness or Wm. Day, the county treasurer, to $36.60, to keep from carrying a balance of $1.60 on the books. This change, of course, was made with the consent of the defendant, and the sum of $36.60 was drawn by him, and was paid upon the supposition of the witness that the check, when presented, was all right. This check is only a part of what is known as and called a school voucher. A school voucher consisted of a teacher's report for a month, and a statement of his account, together with a check on the treasurer, such as the one exhibited to witness, and a receipt from the teacher to the trustees for the check. The said receipt is at the bottom of the voucher, and when signed by the teacher is torn off and kept by the trustees. The report, accounts and check are presented to the county judge, and after approval by him the account and report are torn off and kept by him, and the check is given to the teacher. The printed indorsement of teachers on school vouchers is on that part retained by the county judge. Nearly all the papers for the negro trustees are made out by the teachers, and the teachers generally sign the names of the trustees.

The witness was here shown some writing done by Dave Syrus, and stated that it was his opinion that this writing and the name "Daev Silsos," as it appears on the check, was done by the same man, but, the witness stated, the character of the writing was such that any person of ordinary skill in penmanship could imitate it easily. Defendant wrote a very fair hand, and had skill enough to easily imitate the writing or signature of Dave Syrus.

W. C. Day was the next witness for the State. He testified that he was treasurer of Freestone county on the 5th day of September,

1882. The check in question being exhibited to witness, he testified that it was presented to him by the defendant for payment. It was originally drawn for $35, but, under the supposition that it was a genuine check, and that the signatures were genuine, it was changed either by the witness or Judge Kirven, to $36.60, to keep from carrying the balance on the books. This change was made by consent of the defendant, and the amount of $36.60 was paid him on the same. It was the opinion of the witness that the body of the instrument, with the exception of the change noted, was in the handwriting of the defendant.

Cross-examined, the witness testified that he was familiar with Dave Syrus's handwriting, and was satisfied that Dave Syrus wrote the name "Daev Silsos" to the check. Booker Stein was not one of the trustees. Booker King was.

Dave Syrus was the next witness for the State. He testified that he knew the defendant. Witness was one of the trustees of Bethlehem School Community in September, 1882. Stepney Nickels and Booker King were the others. The defendant never taught school for that community, and was never in that school more than half an hour. The check in question being shown witness, he declared that he did not sign it, nor did he authorize the defendant or any one else to sign it for him. He never authorized the defendant to draw any money from the county treasury. The signature, though better than witness can write it, looks very much like his signature.

Cross-examined, witness denied that he had ever had an agreement with defendant to the effect that the defendant was to draw the money and afterwards teach the school. The trustees of the Bethlehem Community failed to reorganize the school for 1883, and the time was out in September, 1882. Witness asked defendant to see Judge Kirven and ascertain whether or not it was too late to reorganize, and he reported that it could be done if it could be shown that the failure to reorganize was not the fault of the trustees. Defendant came around again and went to town to interview Judge Kirven, and see if he could not fix it up. That same night he returned and came to see witness, leaving a note which he said was from Judge Kirven, about the money,— that it was all right. Defendant was to return the next day and organize the school, but he failed to put in his appearance, and the school was never reorganized. Witness put the paper in a book and saw it no more until at the next meeting of the trustees, a year later. Witness then for the first time learned that the money had been drawn by

the defendant. Here witness was shown a receipt from C. R. Thomas, as teacher, to Dave Sios and Booker Stein, trustees, for a check for $35. He declared this to be the paper, or one very like the paper, that defendant gave him. He kept this receipt a year without reading it, and finally left it with the grand jury. When the trustees had the meeting referred to, witness told him that he had a letter at home from Judge Kirven concerning the money paid defendant. Witness went home and got the paper, and found it to be the receipt in evidence. He took this receipt with him before the grand jury, and left it there.

Booker King was the next witness for the State. He testified that prior to his removal from the limits of the Bethlehem School Community, in the fall of 1881, he was one of the school trustees. He did not live in that community in September, 1882. When he moved out of the community, he told Dave Syrus, the president of the board of trustees, to supply his place with some one else, and never afterwards heard more of the matter. He did not sign the school check or voucher exhibited, nor did he authorize defendant or other person to do so. Witness's only name was Booker King, and he had never been called Stein.

Stepney Nickels testified, for the State, that in September, 1882, he was one of the trustees of Bethlehem School Community. Dave Syrus and Booker King were the others, Booker's place never having been supplied after he moved out of the community. Witness did not sign the check exhibited, nor did he authorize any one to sign it for him. The defendant never taught school in the Bethlehem Community.

Cross-examined, the witness stated that he served the community named as trustee for two years, during which time he signed but one paper as such trustee. He signed that paper for a teacher who was about to commence teaching school. Dave Syrus was president of the board, and had more to do with school matters than any one else. Two terms only were taught while witness was trustee.

The State, over defendant's objections, next introduced in evidence the alleged forged check, of which the following is a copy:

"No. 4.                                                        $36.60.
"BETHLEHEM SCHOOL COMMUNITY, No. 51.
"FREESTONE COUNTY, TEXAS, Sept. 1, 1882.
"Pay to C. R. Thomas or order the sum of thirty-six and sixty cents, $36.60, Dollars, out of the Public School Fund belonging to the Bethlehem Community No. ——, for services as teacher in the

Public School of the said Community, for the month ending the first day of Sept., 1882.

"DAEV SILSOS,

"STEPNEY MICHELS,

"BOOKER STEIN,

"Trustees of Bethlehem School Community, No. 51,

in Freestone County, Texas."

" *To W. E. Day, County Treasurer, Freestone County, Texas.*"

The said check or voucher bears, across its face, the following indorsement: "Sept. 5th, 1882. Approved. O. C. Kirven, County Judge, Freestone County, Texas." Attached to this instrument were the following affidavit and certificate:

"THE STATE OF TEXAS, }
     *County of Freestone.* }

"Before me personally appeared C. R. Thomas, who, having been duly sworn, deposes and says that the amount called for in the above check is correct and just, and that the service was rendered in conformity to the contract, and the school law and the regulations.

"C. R. THOMAS, Teacher."

"In testimony whereof I have hereunto subscribed my name and affixed the seal of my office, this the 5th day of Sept., 1882.

"O. C. KIRVEN, County Judge."

The State closed.

The defense introduced and read in evidence the receipt given by the defendant to Dave Syrus, as follows:

"Received of Dave Sios, Booker Stein, trustees of Bethlehem School Community, No. ——, in Freestone county, Texas, check No. 4 for $35, in full settlement of my account as teacher in the Public Free School of said community, for the month ending Sept. 1, 1882.

"C. R. THOMAS, Teacher."

The defense next introduced Ben Morgan, who testified that he knew both the defendant and Dave Syrus. He saw the parties named at church on or about the 1st day of September, 1882. He heard Syrus speak to defendant at that time and say: "Thomas, you are the very man I want to see. We have failed to organize our school community, and there is still about $35 balance in the treasury, and I want to know how we can draw it out." Thomas, the defendant, replied: "It can be drawn out now, and the school taught when the community is reorganized, if it is all right with the trustees." Syrus said it was all right with the trustees, and the two went off together, talking about it.

Cross-examined, the witness stated that he knew this conversation to have occurred between defendant and Syrus before the money was drawn, because Syrus spoke of it being then in the treasury. Witness knew that the money was afterwards drawn out by the fact that in February, 1883 or 1884, he heard Syrus say that he had Charley Thomas grabbed, or else Thomas had to teach the school for him,— that Thomas had drawn the $35, and promised to teach it out,— that Thomas was a good teacher and had to teach. Witness denied that, during the week previous to this trial, he said to W. M. Blackney, in the presence of De Witt Terry and others: " We niggers are going to swear Thomas out in this case, and get Dave Syrus in, because he is a witness against Berry Adams."

Savannah Morgan, the wife of the last witness, testified, for the defense, that late in 1883 or early in 1884 Dave Syrus spoke to her about sending her children to the Bethlehem Community School. He said they had a good teacher in C. R. Thomas, who had drawn some money from the treasury and was bound to teach.

On cross-examination, the witness testified that when Syrus came to her house he asked how many children she had, saying that he was going to reorganize the school community, had secured the defendant as teacher, and arranged matters so that the necessary money could be obtained. Witness could not fix the exact time of this conversation, but it was about a year before the defendant was indicted. Defendant closed.

W. F. Chandler testified, in rebuttal, that he had examined and compared the signature of " Daev Silsos" on the check with the signature of Dave Syrus, and was of opinion that the two were written by different persons. He did not think that the body of the check was written by the same hand that wrote the signature " Daev Silsos."

A. G. Anderson was qualified as an expert, and, comparing the signature on the check with Dave Syrus's acknowledged signature, testified that the two were not written by the same hand. Witness was here shown a copy of the writing of Syrus made by W. R. Boyd, and said that Boyd's imitation was more like Syrus's writing than was the signature to the check in question. Syrus's handwriting was very easy of imitation.

W. M. Blackney, for the State, testified that he knew the witness Ben Morgan. During the previous week, in the court-house yard in Fairfield, in the presence of De Witt Terry, Ben Morgan told witness that they (the negroes) were going to swear the defendant clear in this case, and get Syrus in because he was a witness against Berry Adams.

Cross-examined, the witness said that he and Ben Morgan were not particularly intimate. Witness went to Morgan and began the conversation. Witness was a State's witness against Berry Adams. De Witt Terry corroborated this witness.

W. R. Boyd testified that he never examined any of Syrus's writing, or attempt at writing, until Syrus signed his name a few minutes before the witness took the stand. Witness then sat down at the desk and made the copy of Syrus's signature he now exhibits. These papers, the one written by Syrus, and the copy by Boyd, were here handed to the jury, over the defendant's objection.

The court refused to permit the defendant to prove Ben Morgan's good character for truth and veracity.

The motion for new trial raised the questions discussed in the opinion.

*Gardner & Etheredge*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE. Before announcing ready for trial, defendant submitted to the court his exceptions to the indictment, upon which he based a motion to quash the same, and said exceptions and motion to quash were overruled by the court. The first ground of the motion to quash was that it does not appear from said indictment that the same was presented in the district court of Freestone county. In so far as this exception is applicable to said indictment, it reads as follows, viz.:

"In the name and by the authority of the State of Texas: The grand jurors in and for the county of Freestone and State of Texas, duly elected, tried, impaneled, sworn and charged in the district court of said Freestone county, Texas, at its February term, A. D. 1884, diligently to inquire into and true presentment make of all offenses committed within the county of Freestone against the penal laws of the State of Texas, upon their oaths present and charge that," etc.

It is to be noted that though the grand jury was a grand jury for Freestone county, impaneled, sworn and charged in the district court of Freestone county, to inquire of offenses committed in Freestone county, it does not appear by direct affirmative allegation that they presented this indictment in the district court of Freestone or any other county.

Amongst the requisites of an indictment prescribed by the Code of Criminal Procedure, the second requisite is that "it must appear therefrom that the same was presented in the district court of the

county where the grand jury is in session." (Code Crim. Proc., art. 420.) This ground of the motion to quash was well taken, and should have been sustained even though the defect pointed out was one of mere form. Any requisite of the statute, whether formal or substantial, should and must be complied with in framing the indictment; the only difference being that defects in matters of form may be corrected under authority of the court, whilst matters of substance can not. (*Bosshard* v. *The State*, 25 Texas Sup., 207; *State* v. *Hilton*, 41 Texas, 565; *Matthews* v. *The State*, 44 Texas, 376; *Long* v. *The State*, 1 Texas Ct. App., 466; *Houck* v. *The State*, 1 Texas Ct. App., 357; *Walker* v. *The State*, 7 Texas Ct. App., 52.)

Another objection urged to the indictment is that it does not set out the alleged forged instrument according to its tenor and *hæc verba*, nor does it profess to do so; and no good cause is shown why it was not done. The allegation is that "said voucher or check is in substance and effect as follows, to wit." Such an allegation does not imply tenor and *hæc verba*. (*Baker* v. *The State*, 14 Texas Ct. App., 332; *Coulson* v. *The State*, 16 Texas Ct. App., 189.) Whilst in some offenses it is permissible, as, for instance, in perjury or swindling, to set forth the instrument by its substance and effect (*Gabrielsky* v. *The State*, 13 Texas Ct. App., 436; *Baker* v. *The State*, 14 Texas Ct. App., 332), yet we are aware of no case holding that such pleading would be sufficient in forgery. Mr. Bishop, speaking of the necessity of setting out the forged instrument, says "the indictment, whether for forging, or having it in possession with the intent to utter it, must by the common law rules set out such forged writing according to its tenor; its mere substance or effect will not suffice. The object of which requirement is, as commonly stated, to enable the court to judge whether or not it is an instrument whereof forgery may be committed. If the instrument is lost or destroyed, or in the defendant's possession, or otherwise where access cannot be had, the disabling fact may be alleged, and then the substance only will suffice." (2 Bish. Crim. Proc. (3d ed.), § 403; 2 Leach, C. C. (4th ed.), 597; 2 East, P. C., 975; 2 Hawks, 248; note to *Wright* v. *Clements*, 2 Lead. C. C. (Bennett & Heard, 2d ed.), 94; 2 Archb. Cr. Pr. & Pl., Pomeroy's Notes, 1567.)

Again, it is claimed that the indictment is bad for uncertainty in that it describes the instrument in the alternative as "*a school voucher or check*." In *The Commonwealth* v. *Gray*, 2 Gray (Mass.), 501, it was held that an indictment was sufficient which alleged that the defendant had in his custody and possession ten counterfeit bank bills *or* promissory notes, payable, etc., knowing them to

be counterfeit and with intent to utter and pass them,—it being evident that "promissory note" was used merely as explanatory of "bank bill," and meant the same thing. (1 Bish. Crim. L. (3d ed.), § 590.) The allegation here is manifestly different from those in *Potter* v. *The State*, 39 Texas, 388, and *Castello* v. *The State*, 36 Texas, 324, which were held bad for duplicity.

We think the allegation that the voucher or check was signed by the trustees of Bethlehem School Community, No. 51, is sufficiently explicit. The allegation is that the instrument purported to be signed by them, and that it was their act (naming them), "as trustees for Bethlehem School Community, No. 51." It showed that they were officers, and purported to act in their official capacity, to wit, as trustees of the school community. (Penal Code, art. 436.)

Nor is the allegation that the instrument "was forged in such a manner as, if true, would have effected a transfer of certain money, property, to wit, $36.60," etc., repugnant to the tenor and legal effect of the instrument, as shown, had it been set out by its tenor and effect. It does not purport to create a pecuniary obligation upon the drawers or signers, but in its recitals proposes expressly to transfer out of the public school fund of the county, in the hands of the county treasurer, the sum of money named as belonging to Bethlehem School Community, No. 51, to the teacher, for his services in the public free school of said community.

As to whether there is repugnancy in the purport and tenor clauses of the indictment with regard to names is not a question which arises on exception to this indictment, since we have already held that the instrument has not been set out by its tenor. Had it been set forth by its tenor, then there might have been not only plausibility but force in the objection urged, because such repugnancy in pleading is always fatal (*Roberts* v. *The State*, 2 Texas Ct. App., 4), just as a variance in proof, where tenor is relied on, is also always fatal; tenor importing invariably strict exactness in description, which must be met by strict exactness in the proof, even in the names appearing in the instrument, unless they are *idem sonans*. (Id.; 2 Bish. Crim. Proc., § 406; *Purchman* v. *The State*, 2 Texas Ct. App., 228; *Burgamy* v. *The State*, 4 Texas Ct. App., 572; *Hunter* v. *The State*, 8 Texas Ct. App., 75; 2 Archb. Crim. Prac. & Plead. (Pomeroy's Notes), p. 1567; *Hardeman* v. *The State*, 16 Texas Ct. App., 1.)

When an indictment undertakes to set forth, as in forgery or libel, a document according to its "tenor," or "as follows," then any variance as to the words of the document, unless such variance be mere fault of spelling, is fatal. (Whart. Crim. Evid., 8th ed., § 114.)

Other objections are ably urged to the indictment in the briefs of counsel for appellant, but the foregoing discussion disposes of those deemed material.

With a view to the probabilities of another trial, we will examine two questions reserved by exception to the ruling of the court as to evidence. Over objection of defendant, the witness Boyd, who had been called as an expert, made an imitation or copy of the signature of the witness Cyrus, whose name was one of those signed to the instrument charged to be forged, and the copy or imitation made by Boyd was exhibited to and handed to the jury, with the signature of the witness Cyrus, for their inspection and comparison, in order to show how easily the name could be counterfeited or forged. Such evidence was wholly immaterial and inadmissible. It could throw no light on the transaction. It might have been perfectly easy for Boyd to counterfeit this signature or any other, and still that fact did not tend in the slightest degree to prove either that defendant did it or that he was competent even to do it. We can readily imagine how such incompetent and inadmissible evidence was calculated to injure and prejudice defendant's case before the jury, and its admission alone would have necessitated a reversal of the conviction.

The State sought to impeach defendant's witness Morgan by proving contradictory statements made by him out of court. Afterwards defendant proposed to prove the general good character of the witness, and his reputation for truth and veracity. This the court refused to permit him to do. Mr. Greenleaf says: "Where evidence of contradictory statements by a witness, or of other particular facts, . . . is offered by way of impeaching his veracity, his general character for truth being thus in some sort put in issue, it has been deemed reasonable to admit general evidence that he is a man of strict integrity and scrupulous regard for truth." (1 Greenl. Evid. (13th ed.), § 469.) Mr. Wharton says the party calling a witness may sustain him by calling witnesses to show that his reputation for truth and veracity is good. (Whart. Crim. Evid. (8th ed.), § 491.) This has always been the rule in Texas, in both civil and criminal cases. (*Johnson* v. *Brown*, 51 Texas, 65; *Burrell* v. *The State*, 18 Texas, 713; *Dixon* v. *The State*, 15 Texas Ct. App., 271.) The court erred in refusing to allow the proposed testimony to sustain the impeached witness.

Several complaints are urged against the charge of the court, but we will not notice them now, as the same objections may not arise at another trial. For the errors discussed and pointed out, the judg-

ment is reversed, and because the indictment is fatally defective in matter of substance as well as form, the prosecution under it is dismissed.

*Reversed and dismissed.*

[Opinion delivered May 13, 1885.]