## The Missouri, Kansas & Texas Railway Company of Texas et al. v. De Bord & Lackey.

Decided November 8, 1899.

**1.  Codefendants—Plea Over—Verdict—Judgment.**

A verdict being rendered for plaintiff for the value of a lot of cattle, against two connecting railways jointly sued for their conversion, and in favor of one defendant on his plea over against the other, who had sold the cattle, and retained the proceeds, for the amount so received,—see judgment thereon held proper as protecting the latter company from a double recovery.

**2.  Same—Joint Defendants—Conversion—Proceeds Held by One.**

The company selling and receiving the proceeds of the cattle was liable over to its codefendant, in case the latter was compelled to pay for them, to the full amount for which they were sold,—not merely that amount less freight and charges.

**3.  Carrier—Cattle Shipment—Feed-in-Transit Contract—Notice.**

The fact that the written contract for shipment of cattle to market, issued by a connecting line of the defendant carrier, failed to embody an agreement made, that the shippers were to have the right to fatten the cattle at an intermediate point, did not excuse a failure to comply with such agreement, where actual notice of its existence was given to defendant, and such agreement was noted on the way bills delivered to it by a connecting line. Nor could such written contract bind the shippers where it was not executed by them.

**4.  Same—Notice.**

The fact that the agreement giving the shippers a right to fatten the cattle at an intermediate point on defendant's line was made by defendant's agent, was notice to defendant; and it was its business to see that the employes routing the cattle had notice which would enable them to carry out such agreement.

**5.  Same.**

Defendant was not relieved from the duty to comply with this contract of its agent by the fact that the connecting line on which the transit commenced issued an ordinary through contract to transport to market without privilege of feeding in transit.

**6.  Non Est Factum—Evidence.**

Where plaintiffs pleaded non est factum in reply to a plea of defendant setting up a written contract for shipment of cattle, and there was no proof of the execution of such contract by plaintiffs, the court properly charged that it was not binding upon them.

**7.  Carrier—Conversion—Damages.**

A carrier who by mistake transports cattle to a wrong destination, and there, on the refusal of the owner to accept them at that point, sells them, is liable for their value,—not merely for the amount received.

**8.  Opinion—Value.**

A cattleman familiar with values from his practice in buying and selling stock, is qualified to testify as to the market value of cattle with which he is familiar.

**9.  Evidence—Meaning of Words, "With Feed Privileges."**

A witness familiar with the management of freight business on railways may testify as to the meaning of the notation upon a way bill, "With feed privileges at McKinney."

**10.  Impeachment of Witness—Conviction in Another State.**

A witness in a civil case can not be impeached by introducing the record of his conviction of felony in another State or Territory.

**11.  Carrier—Contract—Through Shipment—Feed in Transit.**

A carrier taking cattle for through shipment to market over its own and a connecting line, which latter company has previously agreed that for a through rate they may be unloaded and fed for market at an intermediate point, is not responsible for the failure of such company to comply with this agreement, where it noted such provision on the way bills of the stock, though it failed to insert it in the written shipping contract.

Appeal from McLennan. Tried below before Hon. Marshall Surratt.

*T. S. Miller* and *Clark & Bolinger*, for appellant.

*Alexander & Atkinson* and *Perkins, Gilbert & Perkins*, for appellees.

Collard, Associate Justice.—Suit by De Bord & Lackey, appellees, against appellants, the Missouri, Kansas & Texas Railway Company of Texas and the San Antonio & Aransas Pass Railway Company, for damages for alleged misshipment and conversion of 250 head of cattle, claiming $8250 damages for conversion, and $2000 additional expenses and losses incurred by appellees in preparation for feeding the cattle.

Appellees allege that they made a contract with the Missouri, Kansas & Texas Railway Company whereby they might purchase and ship cattle from points in southern Texas and have them carried by the Missouri, Kansas & Texas Railway Company to their feeding pens at McKinney, Texas, there to be fed and fattened for sixty or ninety days, and then carried to market for an agreed rate; that plaintiffs bought the 250 head of cattle at Alice, Texas, on the line of the San Antonio & Aransas Pass Railway Company, and informed its agent that the cattle were to be shipped to McKinney, Texas, and were not to go direct to East St. Louis; that both defendants were informed that the cattle were to be fed and fattened at McKinney, Texas; that the San Antonio & Aransas Pass Railway Company received the cattle, made out bills of lading, ten in number, one for each car, without the knowledge of plaintiffs, showing the destination of the cattle to be East St. Louis, but indorsed on the waybills "with feeding privileges at McKinney," and then shipped them on to East St. Louis; that the defendant the Missouri, Kansas & Texas Railway Company received the cattle from the San Antonio & Aransas Pass Railway Company at Waco, Texas, and made another waybill providing that the cattle should go to East St. Louis, having received the waybills from the other company with the indorsement providing that the cattle were shipped "with feeding privileges at McKinney." Plaintiffs also allege that the Missouri, Kansas & Texas Railway Company was notified at Waco, where it received the cattle, by one McKenzie, who accompanied the cattle for the owners, that the cattle were to be fed and fattened at McKinney, Texas, That the Missouri, Kansas & Texas Railway Company disregarded its obligations, as stated, and carried the cattle on, without stopping, to East St. Louis, Ill., and there converted them to their own use, of the value of $8000, and that plaintiffs were further damaged in the sum of $2000 in preparing to take care of, feed, and fatten the cattle at McKinney, itemizing the expenses.

The Missouri, Kansas & Texas Railway Company filed demurrrers, and answered that the cattle were delivered to it billed to East St. Louis, Ill., and that it performed the contract according to the bills. It also answered that the item of $2000 for expenses was special damages, and

that the same were not recoverable because no notice is shown to it that such damages would result from a misshipment of the cattle. It also pleaded a general denial, and specially that it did not make the contract alleged, but simply made a verbal agreement by its live stock agent, S. J. Williams, to the effect that if plaintiffs purchased cattle on the line of the San Antonio & Aransas Pass Railway Company and desired to feed and fatten them at McKinney, Texas, and would bill them by way of Greenvillle, Texas, to McKinney, it would carry them to East St. Louis, after they were fattened, on a through shipment rate; that plaintiffs failed to bill the cattle direct to feeding pens by way of Greenville; that they were billed direct to East St. Louis, on a through shipment contract, and that this defendant had no notice that the cattle were intended to be fed at McKinney, Texas, and it carried them direct to East St. Louis, as it was required to do by the contract of shipment and the waybills accompanying the cattle; that after it received the cattle at East St. Louis it offered to return them to plaintiffs, and they refused to receive them and pay the charges for shipping back to McKinney, Texas, and also refused to receive them at East St. Louis, and this defendant was compelled to sell the cattle to save expense and collect charges, which sale was made for $6000, and after deducting expenses of shipment, feeding, and sale, $3633 were left net proceeds, which sum is tendered to plaintiffs. That if plaintiffs directed the San Antonio & Aransas Pass Railway Company to ship the cattle to McKinney, Texas, that company failed to comply, but executed through shipment contract from Alicé, Texas, to East St. Louis, and notified the defendant by telegrams before arrival, that the cattle were destined for East St. Louis, Ill., and so caused this defendant, without notice, to carry the cattle to East St. Louis, and prayed that if it be held liable to plaintiffs over the net proceeds of the cattle, it have judgment over against the San Antonio & Aransas Pass Railway Company. It also pleaded that plaintiffs were estopped from claiming damages against it because their agent, C. W. McKenzie, on arrival at Waco, executed a contract in writing for shipment from Waco to East St. Louis, and he failed to notify this defendant, at Waco, of the destination of the cattle, and during the entire distance from Waco to St. Louis executed to various conductors in charge of the cattle receipts showing the condition and movement of the cattle; that while at Denison, Texas, where the cattle were unloaded and fed, he made no request to defendant or its agents that the cattle were to be shipped to McKinney, well knowing that the distance from Denison to McKinney was only fifty miles, whereby plaintiffs are estopped from claiming damages.

The San Antonio & Aransas Pass Railway Company answered by demurrer, set up want of notice of special damages and general denial, and alleged that it did not agree to ship the cattle to McKinney, but refused to do so; that appellees stated they had a contract with the Missouri, Kansas & Texas Railway Company for feeding privileges at McKinney, and agreed that the cattle be billed direct to East St. Louis;

that it only undertook to carry the cattle to Waco, the end of its road; and if the cattle were carried to East St. Louis instead of McKinney, Texas, it was due to plaintiffs' negligence in billing the cattle, and it was also due to the negligence of the Missouri, Kansas & Texas Railway Company in not following the waybills, which had indorsed on them, "with feeding privileges at McKinney," and by ignoring the directions of McKenzie, who accompanied the cattle and requested that they be carried to McKinney. It further showed that its codefendant had $6000 in its hands, proceeds of the cattle, less charges, and it prayed for judgment over against the Missouri, Kansas & Texas Railway Company in case judgment should be had against it.

Plaintiffs denied the execution of the bill of lading at Alice, Texas, set up by defendants under oath, and also the execution of the bill of lading at Waco.

There was a jury trial, resulting in a verdict for plaintiffs against both defendants for $8078.12, and for defendant the San Antonio & Aransas Pass Railway Company against the Missouri, Kansas & Texas Railway Company of Texas, for $6000. Judgment was rendered for plaintiffs against both defendants as required by the verdict, stipulating that plaintiffs should have but one recovery, and also stipulating that should the San Antonio & Aransas Pass Railway Company pay or be required to pay a greater sum than $2078.12, and interest from date, it should recover of the Missouri, Kansas & Texas Railway Company of Texas the excess above the $2078.12, and it was further provided in the judgment that in no event should the San Antonio & Aransas Pass Railway Company recover of the Missouri, Kansas & Texas Railway Company of Texas any sum except so much of the judgment as it may pay in excess of the said sum of $2078.12. So the judgment for plaintiffs was against both defendants for $8078.12 in favor of the San Antonio & Aransas Pass Railway Company against the Missouri, Kansas & Texas Railway Company for $6000 of that amount, adjudging both defendants liable for the remainder of the judgment, $2078.12, without further adjustment between them, holding the Missouri, Kansas & Texas Railway Company liable to the San Antonio & Aransas Pass Railway Company for the gross amount received from the sale of the cattle.

*Findings of Fact.*—We find the facts as follows: Appellees were dealers in cattle, buying, selling, and shipping, and had made many shipments over the Missouri, Kansas & Texas Railway prior to this controversy. One S. J. Williams was the traveling live stock freight agent of the Missouri, Kansas & Texas Railway Company, authorized to contract for shipment of stock over its lines.

De Bord & Lackey contemplated buying and feeding cattle,—to purchase them along the line of the San Antonio & Aransas Pass Railway and feed them at Sulphur Springs and McKinney, Texas, and then ship them on to market. Lackey, one of the plaintiffs, saw S. J. Williams, live stock agent of the Missouri, Kansas & Texas Railway Company,

first at Sulphur Springs and then at Fort Worth, and an agreement was made that the Missouri, Kansas & Texas Railway Company would give plaintiffs a feed-in-transit rate over the Missouri, Kansas & Texas Railway, the cattle to be shipped to it by the Aransas Pass Railway, fed and fattened at McKinney and Sulphur Springs, and then carried on to market.

Williams sent the following dispatch to John W. Lackey, plaintiff, from San Antonio, dated 3/1, '95: "Came here to see you. If you buy route via Waco, our line, and Greenville. Will protect feeding rate from points on the Aransas Pass. Advise me at Fort Worth what you do."

Lackey, after the agreement with Williams, purchased the cattle described in the petition at $25 per head and had them delivered at the stock yards of the Aransas Pass at Alice, Texas. He instructed the agent of the San Antonio & Aransas Pass Railway Company at Alice, Texas, to bill or route the cattle by way of Waco and Greenville, and for fear the agent would route the cattle wrong, gave him the above message from Williams, so that he would make no mistake in billing them. Lackey informed the agent that McKenzie, then present, would go with the cattle. Before the cattle were billed and shipped from Alice, Lackey was compelled to leave to see to another train of cattle at Driscol.

The agreement with Williams was made about ten days before the cattle were purchased. When cattle were billed locally, as these cattle were to be, it was understood that they were to be fed and fattened at the point designated. Lackey instructed the agent of the San Antonio & Aransas Pass Railway Company to bill the cattle to McKinney, and by this billing he expected the railroad officials to know that the cattle were to be fed and fattened there. McKenzie went along with the cattle to keep them up, and he had no other authority concerning the shipment. No one was authorized to sign any shipping contract for plaintiffs.

The agent of the San Antonio & Aransas Railway Company on the 6th of March, 1895, at Alice, prepared a shipping contract for the cattle, 250 head, which he signed for his company, and also signed the names of De Bord & Lackey to the same, which contract agreed to carry the 250 head of cattle from Alice, Texas, to the National Stock Yards at East St. Louis, Ill., at the regular rate, which was $10 less than the feed-in-transit rate. He also prepared, to accompany the shipment, certain way bills, which are for the use of the train men and agents, showing the origin of the shipment to be Alice, Texas, destination, East St. Louis, Ill., De Bord & Lackey, consignors and consignees, upon which was written in plain words, "with feed privileges at McKinney." The 250 head of cattle were loaded on cars at Alice on March 6th and moved, arriving at Waco, the terminus of the San Antonio & Aransas Pass Railway Company's line before daylight on March 7, 1895, where they were delivered to the Missouri, Kansas & Texas Railway Company of Texas, McKenzie accompanying the shipment as cowpuncher.

The agent of the Missouri, Kansas & Texas Railway Company at

Waco, upon receiving the cattle, prepared a live stock contract of shipment similar to that of the San Antonio & Aransas Pass Railway Company, to carry the cattle to East St. Louis, and called on McKenzie to sign the same for De Bord & Lackey. McKenzie objected, and informed the agent that the cattle were to be fed and fattened at McKinney. The agent told McKenzie that if he expected to go with the cattle, he would have to sign the names of appellees to the contract, whereupon McKenzie signed their names to the contract. He had in his possession the contract or a copy originally made with the San Antonio & Aransas Pass Railway Company and handed it to the agent at Waco. The agent at Waco for the Missouri, Kansas & Texas Railway Company had the waybills, ten in number, one for each car, prepared at Alice, received them from the conductor of the San Antonio & Aransas Pass Railway Company, and took a record of them, East St. Louis being the destination. He did not that night see the notation on them, "with feed privileges at McKinney." "McKinney is down on the right of Denison, a little south, on a road running from Greenville."

We here copy a portion of the testimony of the agent of the Missouri, Kansas & Texas Railway Company, to make more intelligible this statement. Sam Crim testified: "I am bill clerk under Geo. H. Bowers, agent at Waco for Missouri, Kansas & Texas Railway Company, and was so engaged in March, 1895, and live at Waco. I was in Waco when plaintiffs' cattle passed through, and I remember about the cattle passing through Waco. [The waybills being presented to this witness he identified them, and said he had handled them before.] The cattle were received at Waco some time between 12 o'clock and the morning of the 7th of March, 1895. A man by the name of McKenzie was in charge of the cattle. I learned his name afterwards. I received the cattle from the San Antonio & Aransas Pass Railway Company, with this man in charge. He came into the office and gave me his contract and pass, as usual. Came in to get his contract and pass. He gave me his pass and I made one from it. [Witness being offered what purported to be a contract between the San Antonio & Aransas Pass Railway Company and the plaintiffs, stated that it seemed to be properly signed. The agent of the San Antonio & Aransas Pass Railway Company and plaintiffs De Bord & Lacky's names were signed to it. Stated that the contract was handed to him by McKenzie.] McKenzie handed me this contract, and I took it to make out another contract and pass for him to go with the cattle. About that time the conductor asked me for the bill. I took up the bills and Mr. Hall said it was a straight shipment to East St. Louis, and McKenzie says: 'I am not going to East St. Louis; I am going to McKinney.' I says: 'The cattle are going to East St. Louis.' I looked over the contract and says: 'I don't see what makes you think you are going to McKinney. They are all billed to St. Louis and the contract calls for St. Louis. What makes you think you are going to McKinney?' and McKenzie says: 'They told me I was going to McKinney.' I replied: 'It is a strange thing you are with these cattle and don't know where

you are going.' And he remarked—I believe he said—he would stay with the cattle; that was all he said. He said 'I guess it is all right,' or 'I will stay with the cattle.' That is all he said. After that I fixed him up a pass in the usual way and gave it to him, and he signed it and went on with the cattle. I signed another paper purporting to be a contract between De Bord & Lackey, and McKenzie signed De Bord & Lackey's names to it. I had these waybills of the ten carloads of cattle, and gave them to the conductor. I got them from the San Antonio & Aransas Pass Railway Company—Mr Jackson, I think, was the party I got them from. He was the night man at the San Antonio & Aransas Pass office, assistant agent of that road. I took a record of the waybills that night. East St. Louis was the destination. I didn't see the notation on the waybills, 'with feeding privileges at McKinney,' that night. McKinney is down on the right of Denison, a little this side, on a road running out from Greenville, and I didn't notice the notation that night. My attention was not called to it by anyone. Nothing was said further than what I have stated, that I remember of. McKenzie made no further remarks that night, except to say: 'I guess it is all right,' or, 'I will stay with the cattle.' Never said another word."

Cross-examined, he testified: "The office of a waybill shows the point of origin, point of destination, car number, consignee, and consignor. When I made up my contract it was based on the contract I got from the San Antonio & Aransas Pass Railway. Saw it corresponded with the waybills, as far as destination, number of car, number of cattle, etc. I made the contract up from the contract McKenzie gave me. I said I didn't see 'with feeding privileges at McKinney' in the waybills. I didn't have it in mind to look for it. Am accustomed to seeing these waybills. I record them. I testified in this case before. I might have said then that the reason I didn't see this notation was that it was not under the destination column; probably so. I looked under the destination column to see where the cattle were going to, and did not find East St. Louis under destination column. The notation is as prominent as East St. Louis, but it was not a continuous sentence. I have been engaged in shipping cattle six or seven years. I know the custom of railroads in reference to notations in waybills which are doubtful. After you notice it they try to ascertain from the point of origin, if they can not ascertain in any other way, what it means. That is the notation. But I never noticed that notation. I took a record of the point of origin, destination, car numbers, and number of cattle. It is a hard thing for anybody to say why I didn't notice it, and it can not be answered by anybody as to why they skipped a notation. I never noticed it; that is all I can say or do about it. In this instance I had the waybills in my possession. Made live stock contract out afterwards."

Cross-examined, he testified: "It was between 3 and 5 o'clock in the morning that these cattle were transferred to the Missouri, Kansas & Texas at Waco. It is not absolutely necessary to make a complete record of everything contained in waybills. We omit little things and put in

the date, car numbers, number of cattle, origin, and destination, consignor and consignee. I had the walbills before me, and took a record of what was on them except some little things. I record all that belongs in the pass book. I have good eyesight, and the notation 'with feed privileges at McKinney' is as large as any of the rest of the waybill. The man with the cattle said he was going to McKinney. I suppose he meant McKinney, Texas, though he didn't say 'Texas.' I told him the cattle were billed to East St. Louis, and that he was going there, if he stayed with the cattle, and I said it was strange he was with the cattle and didn't know where he was going. I was not with him but a very little time, but he never appeared to be very bright. I didn't say that he was not bright enough to know where he was going. Nearly all the stockmen know where to sign, but I had to show him. I told him to sign De Bord & Lackey's name to the contract. He went out of the office and got on the train. I believe I showed him around to the train. Don't think I put him on the caboose. I had not been to bed that night. Don't know whether I had laid down or not. Wasn't sleepy. I was reading the waybills to the conductor when McKenzie spoke up and said the cattle were not going to St. Louis. When he said that I did look. Didn't see the notation. I can see it now, but didn't see it then."

On re-direct examination, he testified: "When McKenzie called my attention to where he was going, I looked at the destination column. Didn't look over all the other parts of it. I looked at the head of the billing. Saw East St. Louis. I never looked anywhere else. Looked at the contract and billing at the same time, and saw that it was nothing but a through shipment to East St. Louis. No notation in the contract whatever. I wasn't looking for feeding notations. There was nothing said about fattening the cattle. It was just the destination that I looked for."

Re-crossed, he testified: "Witness indicated destination column and stated as follows: East St. Louis is not under the destination column. National Stock Yards is the destination. East St. Louis is not under it."

It was proved that the notation on the waybills, "with feeding privileges at McKinney," has a definite meaning among railroad people, and it signifies that the cattle were to be stopped and fed at McKinney for fattening purposes, then to be carried on to final destination. In this case, the shippers were to pay $10 per car for the privilege of feeding and fattening en route, and it is called a "feed-in-transit" rate.

This shipment of cattle was carried on through to East St. Louis without stopping to feed and fatten, as directed by Lackey, and as indicated in the waybills. Plaintiffs had shipped cattle before this shipment with feed-in-transit privilege, and the cattle had been stopped to be fed and fattened en route.

McKenzie, who went with the cattle for the owners, testified, and we so find the fact to be, that he notified the agent of the Missouri, Kansas & Texas Railway Company at Waco and the conductor that the cattle

were destined to McKinney, and that he gave the same notice to the yard master of the Missouri, Kansas & Texas Railway Company at Denison, Texas.

The Missouri, Kansas & Texas Railway Company made out new contracts of shipment at Waco, similar to the contracts made by the San Antonio & Aransas Pass Railway Company, but these contracts were not signed by plaintiffs nor by their authority for them. They were for carrying the cattle direct from Waco to East St. Louis.

On the 7th day of March, 1895, De Bord, one of the plaintiffs, went to Greenville, Texas, to meet the cattle, and not finding them there, used the wires to ascertain their whereabouts and exercised due diligence for this purpose, but failed to get information. The cattle arrived at Denison, March 7th, and remained there about five hours, and were fed; and were then carried on to East St. Louis, where, plaintiffs not having made arrangements for receiving them and failing to receive them, they were sold by the Missouri, Kansas & Texas Railway Company, as stated in its plea, for the amount admitted therein, and after deducting expenses, as alleged, they have in their hands the amount stated, subject to plaintiffs' demand.

We note that the contract of shipment originally made by the San Antonio & Aransas Pass Railway Company, signed only by the company's agent, was an agreement to carry the cattle to East St. Louis. The waybills, for the use of trainmen, agents, and employes of the company, alone contained the provision as to feed privileges at McKinney, Texas, which provision was overlooked by the agent of the Missouri, Kansas & Texas Railway Company in billing the cattle through to East St. Louis. The contract of shipment originally made at Alice contained no such provision. It was written in the way bills.

The plea of defendant the Missouri, Kansas & Texas Railway Company estimates the gross proceeds of the sale of the cattle at $6000, and claims deductions of shipping to East St. Louis and expenses at $2367, and admits balance due plaintiffs, the net proceeds of the sale, $3633, which the plea tenders to plaintiffs. The verdict and judgment make both defendants liable to plaintiffs in the sum of $8078.12, conditioned that if the San Antonio & Aransas Pass Railway Company be required to pay more than $2078.12 that it recover the excess from the Missouri Kansas & Texas Railway Company.

The agent of the Missouri, Kansas & Texas Railway Company of Texas had the waybills in his possession, and ought to have known their contents, but he did not in fact see the notation as to feed privileges at McKinney.

*Opinion.*—1. The appellant the Missouri, Kansas & Texas Railway Company of Texas contends that the verdict awarded a double recovery against it, viz., for the $6000 received by it, in favor of the San Antonio & Aransas Pass Railway Company, and in favor of the plaintiffs for $8078.12.

The judgment fully protected the defendant, requiring it to pay the $6000 received from the sale of the cattle, and adjudging both defendants liable for the residue, $2078.12, stipulating that there should be no double recovery. There can be no just complaint as assigned. The court below, in its judgment, correctly construed the legal effect of the verdict.

2. The verdict makes the defendant the Missouri, Kansas & Texas Railway Company liable for the gross amount received from the sale of the cattle; and in this there was no error, though it did not follow the directions of the charge to deduct expenses of carrying and feeding. The verdict is correct.

3. The same appellant contends that the court erred in refusing its special instruction to the effect that the contract of shipment exhibited to it at Waco gave it no notice that the cattle were to be fattened and fed at McKinney, and that there was no evidence showing notice to it of a destination different from that as stated in the contract of shipment, therefore the verdict should be in its favor.

There was evidence of notice to this defendant of the fact that the cattle were to be stopped en route to be fed and fattened, and its agent was at fault in not observing the notation on the waybills, plainly written, showing that the cattle were not to be shipped straight through to East St. Louis. No legal excuse is given for failure to observe and follow the notation, nor for ignoring the notice given by McKenzie.

The requested charge was not correct in another particular; it states that plaintiffs executed the contract at Alice. It was not executed by plaintiffs. Plaintiffs' plea of non est factum put the burden upon defendants to prove the execution of the contract by plaintiffs, and there was no attempt by defendants to make the proof. On the contrary, it was proved that it was not executed by plaintiffs or either of them. The contract of shipment was not plaintiffs' contract, and the requested charge was not correct in stating the contrary.

4. We find no error in the court's charge upon notice, nor in refusing the charge asked by the defendant the Missouri, Kansas & Texas Railway Company upon the subject, as set up in this appellant's sixteenth assignment of error.

The defendant had empowered its agent Williams with authority to make the contract that was made with De Bord & Lackey, by which they were to feed and fatten the cattle en route to market. It is not contended that Williams exceeded his authority in making the agreement, and he in fact did not. He was acting within the fair scope of his authority. He acted for the company and represented it. His knowledge and information upon the subject would be attributed to his principal, and the company would be charged with knowledge of his acts done by its authority. If the company failed to inform Crim, its local agent at Waco, of the facts, it would be its own fault. It is not intimated by defendant that if Crim had known this shipment was upon a feed-in-

transit contract he would have ignored it.   He attempts to excuse the misshipment upon the ground that he did not know the shipment was of the character provided for in the contract of the agent Williams.  His excuse, however, as we have seen, only shows his own neglect, which can not be charged to plaintiffs or the other codefendant.   As to notice to an agent, see Railway v. Thompson, 44 S. W. Rep., 8.

5.   There is no error in the fourth and seventh paragraphs of the court's charge, as insisted by appellant the Missouri, Kansas & Texas Railway Company, of which it can complain.   Appellant contends that its agents were bound to look alone to the shipping contract, as in the bills of lading issued at Alice by the San Antonio & Aransas Pass Railway Company, to ascertain their duties to this shipment.   This contention can not be correct.   Plaintiffs did not execute the contract with either of the defendants, and this defendant the Missouri, Kansas & Texas Railway Company knew or ought to have known, and is chargeable with notice of the fact, that the shipment was "with feed privileges at McKinney," to be fed and fattened there, notwithstanding the shipment was on a through rate and finally destined to East St. Louis.   The feeding privilege at McKinney was not incompatible with the through shipment and final destination, and the facts would not warrant the exclusion of the feed-in-transit privilege even if plaintiffs had executed the shipping contract as in the bills of lading; and by a much stronger reason, they would not be bound by the contract not executed by them. The so-called contract was nothing more than a mere direction by the defendant, and of no higher standing nor binding effect upon plaintiffs than the waybills.   In fact, the waybills controlled the shipment as to the feeding privileges, they being the only definite direction upon that subject not inconsistent with the shipment.

6.   The court was not in error, in defining the effect of the contract of shipment as to plaintiffs, in telling the jury that it was not binding upon plaintiffs as a contract, they having pleaded non est factum thereto, and there being no proof of execution by them.   As contracts of plaintiffs, they were not before the jury, and it was proper to so inform them.

7.   The proof amply supports the verdict and judgment against the Missouri, Kansas & Texas Railway Company for the value of the cattle. The company again erroneously insists, in this connection, that the contracts of shipment were the contracts of plaintiffs, and as such were binding upon them, and relies upon the full performance of the same, according to the terms of the same, and claims thereby a full discharge of all its duties.   This contention can not be sustained, as we have before seen.   The Missouri, Kansas & Texas Railway Company was and is liable to plaintiffs for the value of the cattle.

8.   There was no error in admitting the testimony of the witness C. C. Wright as to the market value of the cattle.   He qualified to testify to the fact.

9.   There was no error in admitting the testimony of the witness J. C. Mangham, of the meaning and effect of the notation on the way bills, "with feed privileges at McKinney."

We have, in the foregoing, discussed the material assignments of error of the Missouri, Kansas & Texas Railway Company of Texas. We have not discussed others, but have considered them, and conclude that they are not well taken.

We find no merit in the most of the assignments insisted on by the San Antonio & Aransas Pass Railway Company as against the appellees. The contention of that defendant that the court erred in allowing the depositions of John W. Lackey to be read in evidence, because he had been convicted of theft of cattle and sentenced to the penitentiary by a court of competent jurisdiction in the Indian Territory, and in refusing to allow the authenticated copy of the indictment, conviction, and sentence to be read in evidence for the purpose of discrediting his testimony, can not be sustained, this being a civil action.   Logan v. United States, 144 U. S., 263, and authorities cited; Pitner v. State, 23 Texas Crim. App., 366; Kennedy v. Upshaw, 66 Texas, 452; Boone v. Weathered, 23 Texas, 675; Johnson v. Brown, 51 Texas, 76; Railway v. Johnson, 83 Texas, 633.

We believe the testimony warrants us in the conclusion that the Missouri, Kansas & Texas Railway Company of Texas is liable to plaintiff for the whole amount of the judgment, and that the judgment should be here so reformed and rendered.

There is no dispute that the San Antonio & Aransas Pass Railway Company, by the waybills, performed its duty to the connecting line, and thereby gave notice that the cattle were to be fed and fattened at McKinney, and that the misshipment and its results were wholly due to the failure of the Missouri, Kansas & Texas Railway Company of Texas to perform its duty to its codefendant.

The judgment is affirmed for plaintiffs against the Missouri, Kansas & Texas Railway Company of Texas, and reversed as against the San Antonio & Aransas Pass Railway Company, and is here rendered in its favor, so that plaintiffs will recover the amount of the judgment against the Missouri, Kansas & Texas Railway Company of Texas alone.

*Affirmed in part, and reversed and rendered in favor of the San Antonio & Aransas Pass Railway Company.*

Writ of error refused.