JOHNSON AND WARREN, EXECUTORS, v. W. H. BROWN ET AL.

51   65
82   121
83   633
30a  564
51   65
33a  42

1. IMMATERIAL TESTIMONY.—The rejection of testimony not shown by the record to have been material, is no ground for reversal on appeal.

2. CHARGE OF COURT—EVIDENCE.—It is not error to refuse instructions which are deductions of fact, or ordinary rules of reason proper to be considered by the jury, and which are legitimate in argument. Only rules of law to be obeyed should be given.

3. CREDIBILITY OF WITNESSES—IMPEACHING WITNESS.—It was not error to refuse to charge the jury that the character of a witness for truth and veracity, put in question by an attempt to impeach him, is referable to the time of the act, and not to the time when the testimony was given.

4. IMPEACHING A WITNESS—PRACTICE.—That a witness does not remember having made statements out of court contradictory to his testimony, will not prevent the admission of his contradictory statements.

5. SAME.—The fact of the witness making contradictory statements, and not his recollection of them, is the basis of their introduction. The preliminary examination is to give opportunity of explanation.

6. IMPEACHING WITNESS.—An attempt was made to impeach a witness by proving his contradictory statements. His testimony was supported by testimony to his general good character : *Held*, Rebutting evidence to the bad character of the witness was properly admitted.

7. SAME—BAD REPUTATION.—It is error to allow evidence of bad reputation of a witness, based upon the matter under investigation before the court. It was error to allow a subscribing witness to a will contested on the ground of alleged forgery, to be impeached by the opinion of the community arising from that transaction.

8. IMPEACHING A WITNESS—PRACTICE.—Suggested, that the proper practice in impeaching a witness by proving his bad reputation should be, that after the impeaching witness has *prima-facie* qualified himself to speak of the general reputation of the other witness, (to be decided by the court,) then, before he answers as to that reputation, the opposite party should have the right to cross-examine as to his means of knowledge.

9. DISCUSSED.—Boon *v.* Weathered, 23 Tex., 686, discussed.

10. EVIDENCE—CONTEST AS TO WILL.—Discussed and held that it is admissible to prove, in a contest as to the genuineness of a will offered for probate, that the testator, before and after the date of the alleged will, expressed unfriendly feelings towards the principal legatees under the will, as evidence of a distinct, independent

collateral fact, which would, in some degree, tend to prove the issue before the court.

11. SAME.—Held, in such contest, that it was error to admit evidence of an attempt by the alleged testator to make a will subsequent to the date of the alleged will.

APPEAL from Leon. Tried below before the Hon. John B. Rector.

John W. Warren died about the last of September, 1874. He was a bachelor, over sixty-one years old. For nearly twenty years he had lived with a kinsman, D. O. Warren, and in his family. No witness had ever heard him speak of his father, mother, sisters, or brothers. In the summer of 1874 he moved to his own farm and lived with Mrs. Martha Samuels. She "fixed his clothes for him when in health," nursed him when sick, and " cried when he died." In his last illness he had no other help, except from his physicians and some negro men. After he moved to his own place he still cultivated land at the D. O. Warren place, and was "at home" there and kept a trunk in the garret. On the day of his burial there was taken from this trunk, brought from the garret, a paper purporting to be his will, of date September 7, 1874. The attempted probate of this paper is the contest in this suit.

October 3, 1874, D. O. Warren and W. M. Johnson filed in the District Court of Leon county an application for the probate of the will of John W. Warren.

October 17, 1874, W. H. Brown, "husband of one of said decedent's deceased sister's children," protested against the probate of "the pretended will," charging that it was "fraudulent and fabricated."

December 14, 1874, Brown and his wife Cornelia J., "in behalf also of the mother of said deceased, Mrs. Nancy Warren; Mary L. Keys, his niece, and her husband; his niece Ida P. McDaniel, his nephew Elijah McDaniel, and his grandnephew Dick McDaniel, further protested, alleging that the pretended will was a forgery."

The proposed will was witnessed by D. E. Shumate and Noah Hallowell, and gave to Mrs. Samuels the farm on which deceased resided; also ten head of stock cattle, a sorrel mare, and a mule for her son; the residue to be divided between Henry M. Warren and David O. Warren.

A jury was impaneled and the subscribing witnesses proved the will, testifying to the statutory requisites. Witness Hallowell testified that he wrote the will, the deceased reading from a form in The Clerk's Assistant, &c., on September 7, 1874, at an office in D. O. Warren's yard.

A great deal of testimony was given for defendants, many denying the genuineness of the signature. It was also proved that the witness Hallowell, the day of Warren's death, in conversation with several persons, stated that Warren had not made a will.

In rebuttal, it was proven by many witnesses that Hallowell bore a good character for truth and veracity. The defendants then, over objection, introduced several witnesses who testified that, since the contest about the will had arisen, Shumate bore a bad reputation, and that he would not now be believed, the opinion principally growing out of his connection with the will. The bills of exceptions show—

On the trial, and over objections, the defendants introduced B. F. Burroughs and others to testify in reference to declarations of the deceased, John W. Warren, showing feelings of hostility towards David O. Warren and Henry Warren, the legatees; also to declarations that they should never have any of his property; that subsequent to the date of the will deceased had stated that "David and Henry Warren and W. A. Taylor had colluded together to rob him of what he had, * * * but he would fix his property so that they could get nothing he had"; and that deceased had several times expressed feelings of great hostility to David and Henry Warren.

Defendants introduced, over objections, C. M. Thomason and A. D. Burroughs to contradict the witness Shumate, by

proving that Thomason, at a time and place named, did ask Shumate "If John W. Warren had made a will ? "—to which Shumate replied, "He had not." The witness Shumate was asked touching the conversation and did not deny it, but stated that "he might have made the statement."

The plaintiffs offered David O. Warren, one of the legatees and executor of the will, to prove at what time he had arrived at Centreville on September 7, 1874, (the day the will bore date,) and the hour he left the D. O. Warren place on said day, and that witness and Shumate had gone together on that day to Centreville. This was objected to and excluded, the objections being to its relevancy, and because the witness was a legatee under the proposed will.

After defendants had closed their testimony and plaintiffs had closed in rebuttal, the court permitted, over objection, defendants to introduce W. A. Patrick and others, who testified that the witness Shumate was of bad character for truth and veracity, &c.; the objections urged being ( 1 ) that defendants, in their opening, had offered the testimony of Thomason and others for the purpose of impeaching said witness, by proving contradictory statements, and had closed their case; and ( 2 ) because the witnesses testified that Shumate's bad character had grown out of his testifying to the execution of the will in controversy,—there having been a former trial.

*M. Surratt*, for appellants.

I. The court also erred in permitting defendants to introduce evidence of the declarations of John W. Warren, expressive of feelings of hostility towards the legatees, Henry and David Warren, when the only question before the court was the naked fact of the forgery of the instrument alleged to be the last will and testament of John W. Warren. (Jackson *v.* Kniffen, 2 Johns., (N. Y.,) 31; Stevens *v.* Vancleve, 4 Wash. C. C., 262; Moritz *v.* Braugh, 16 Serg. & Rawle, (Penn.,) 403; Comstock *v.* Hadlyme, 8 Conn., 254; Smith *v.* Fenner, 1 Gallison C. C., 170; Dan *v.* Brown, 4 Cow., 483;

Cawthorn *v.* Haynes, 24 Mo., (3 Jones,) 236; Provis & Rowe *v.* Reed, 15 Com. Law R., (5 Bing.,) 435. All reviewed and affirmed in Waterman *v.* Whitney, 11 N. Y., 157; and also in Boylan *v.* Meeker, 4 Dutcher, (N. J.,) 276; and see 8 Ad. & E., 14.)

In the case of Boylan *v.* Meeker, all the authorities, both in England and America, are reviewed, and the rule again laid down, that in questions not involving in any degree the mental capacity of the testator at the time of the execution of the will, his declarations, made before or after the execution of the instrument, are not competent to prove fraud, duress, or forgery, or to disprove the execution,—they are hearsay merely; that his conduct and declarations, manifesting an ignorance of the existence of the will, are not competent to show that he had not made the will. "The rule upon these points is the same in the case of wills that it is in the case of deeds." (1 Redfield on Wills, ch. 10, sec. 3, pl. 6 *s*, 558, 559.) For the rule as to deeds, see 32 Tex., 202; 27 Tex., 231, 282; see, also, as establishing the rule above laid down, 1 Red., ch. 10, sec. 3, pl. 6, *a* to *t*, and notes, where the author reviews an unusually large number of cases, pointing out the different purposes for which declarations are received and rejected. It will also be noticed, that in all cases where the declarations are received for any purpose, the signing of the will by the testator is admitted, but sought to be avoided; and in no case that I have been able to find, even by reference, have they been received where the execution of the will was denied. In such cases, the testator is not a party to the question of the validity of his will, and his declarations are hearsay, depending upon his veracity at the time of making them for their force as evidence, and stand upon the same footing with those of other third parties. In the case of Cawthorn *v.* Haynes, 24 Mo., (3 Jones,) 236, the declarations of the testator, both before and after the execution of the will, were very similar to those admitted in the present case, over the objections of the plaintiffs, viz., that the legatees named in

the will should never have any of his property, and express-
ive of feelings of hostility towards the legatees, and that he
had no will; and in that case the court say that such declara-
tions were clearly inadmissible, upon well-established rules of
law, to establish the invalidity of the will. And in Gibson
*v.* Gibson, Id., 227, the declarations of the testator, made sub-
sequent to the alleged execution of the will,—"that he never
made the will; that if he signed it, they got him drunk and
made him do it; that he had no recollection of it,"—were
held inadmissible to establish its invalidity. See, also, 26 Vt.,
38, where declarations were held inadmissible to establish, or
as tending to establish, the fact stated in the declaration.

II. It is contended, also, that the court erred in admitting
the declarations of John W. Warren while on his deathbed,
and also of the fact that he was in the act of making another
will when he died, but which was not completed, and conse-
quently not a revocation of any previous will, and not so con-
tended by the defendants in the court below, or offered to es-
tablish that fact, but solely to establish the one and only issue
presented in this case, viz., that the will before the court, of
a previous date, was a forgery. The fact that the deceased
was making a will at the time of his death, which was not
completed, but barely commenced, is no evidence that he had
not previously made this will, which was executed some
months previous; nor are his declarations accompanying that
act, that he did not intend to give the legatees in this will
any of his property by that one, any legal evidence, or do
they tend, in any remote degree, to establish whether or not
he had executed this will. They are not competent evidence
to be considered by the jury in determining upon the validity
of this will. They are altogether irrelevant; and while, if
admitted, they prove nothing concerning the execution or
non-execution of this will, yet their direct and inevitable tend-
ency is to prejudice the jury against the genuineness of this
will and all the parties connected with it.   *   *   *

*James C. Walker,* for appellants, filed an exhaustive brief and argument, discussing in detail the assignments of error and the facts.

*Thomas Harrison,* for appellees.—It is argued against us that the declarations of John W. Warren, to the effect that the legatees should not have any of his property, and evincing hostile feelings toward them, should not have been admitted as evidence. These declarations were begun more than one month before his death. His last utterances were hostile to the legatees. It is not to be denied that the authorities upon this point are conflicting.

Mr. Redfield, in his work on the Law of Wills, collates many of the cases bearing upon the point, and finally argues himself to the conclusion, that " where the execution of a will is proved in the mode required by law, the declarations of the testator, made before or after the execution of the instrument, are not competent to prove fraud, duress, or forgery, or to disprove the execution,—they are hearsay merely." (1 Red. on Wills, 557–559.) But he says, pp. 559, 560 : " There can be no question that the practice of the Ecclesiastical Court is in conflict with the decision here made; that such declarations are constantly received upon the issue of fraud and undue influence to establish the leading facts upon which the charge is founded."

Chancellor Walworth, in Betts *v.* Jackson, 6 Wend., 173, says: " The uniform practice of the English testamentary courts has been to receive such declarations. * * * Whatever may be the names of these courts, it is well known that the offices of judge of the Consistory Courts of London, the Prerogative Court of Canterbury, and the Court of Arches, have, for the last forty years, been filled with such men as Sir William Wynne, Sir John Nicoll, Sir Christopher Robinson, Dr. Lushington, and Sir William Scott, the late distinguished judge of the Court of Admiralty; that their decisions are constantly reviewed, on appeal, by the Court of Dele-

gates, composed of judges of the King's Bench and Common Pleas and Barons of the Exchequer, as well as of Doctors of the Civil Law.   The decisions of these courts, therefore, * * are entitled to the same respect as those of any other courts of Great Britain,   *   *   as to any matter within their appropriate jurisdiction; and since the establishment of regular reports, their decisions exhibit a well-digested system of testamentary and matrimonial law, which deserves the attentive examination of every lawyer in this country."

The case of Jackson *v.* Kniffen, 2 Johns., 31, so often quoted to sustain the conclusion of Mr. Redfield, was decided in 1806 by a divided court—Kent, Ch. J., Thompson, J., and Livingston, J., concurring, and Spencer, J., and Tompkins, J., dissenting, in an able opinion which carries confidence by its weight of argument and authorities.   The case of Dan *v.* Brown, 4 Cowen, 483, the first of a series of cases arising out of the will of Benajah Brown, decided in 1825, relies upon and follows Jackson *v.* Kniffen; and Jackson *v.* Betts, 6 Cowen, 382, upon the same will, decided in 1826, in a brief paragraph, announces the same principle and relies on Dan *v.* Brown.

The same will was discussed in Betts *v.* Jackson, 6 Wend., 173, in which Chancellor Walworth delivered an elaborate opinion, severely questioning the foregoing cases.

These cases are reviewed in Waterman *v.* Whitney, 11 N. Y., 165, and the earlier doctrine of Jackson *v.* Kniffen is maintained, but still with a divided court.   Even in New York it cannot be said that the doctrine laid down in Redfield is the settled law.   (Ram's Legal Judg., 316.)   His conclusions· are further weakened when it is seen (1 Red. on Wills, 557–559) that he makes no distinction between the declarations of the maker of a will and the declarations of the maker of a deed, after the title has passed from him. (Jackson *v.* Kniffen, 2 Johns., 31, dissenting opinion of Spencer; Thompson *v.* Herring, 27 Tex., 285.)

Mr. Redfield's conclusion is not sustained by the authori-

ties, and is opposed by the weight of reasoning. (Red. on Wills, 538–560, notes 22, 26, 38; Tyler on Eject. and Adv. Enj., 506; Lucas v. Carmichael, decided by the Court of Appeals of Kentucky, Feb. 4, as found in the Reporter, vol. 5, p. 557; Wigram on Wills, 281, *et seq.;* Durant v. Ashmon, 2 Rich., 189; 1 Mann. & Ryl., 525; Doe v. Harris, 7 Carr. & Payne, 331; Roberts on Wills, 455; 1 Greenl. Ev., sec. 108; 1 Phill. Ev.; 4 Phill. Ev., C. & H.'s Notes, 271; Nelson v. McGiffert, 3 Barb. Ch., 162; Hester v. Hester, 4 Dev., 228; Howell v. Barden, 3 Dev., 444; Tynan v. Paschal, 27 Tex., 288–300.)

Reel v. Reel, 1 Hawk., 247, 269, 278, was decided fifteen years after Jackson v. Kniffen, and nine years after Smith v. Fenner, 1 Gall., 179. Judge Ruffin delivered the opinion of the court. He says: "For these reasons and those given by Judge Spencer, who, together with Judge Tompkins, dissented from the opinion of the court, and because of the doubt which rested for some time on Judge Livingston's mind, we think we are bound to disregard the opinion of the court in 2 Johns., 31, and also in 1 Gall., 170."

In the case of Tynan v. Paschal, the question now presented seems to have been fully considered and finally decided. (Red. on Wills, 72; Beaubien v. Cicotte, 12 Mich., 459.)

The question arises—the only question: Is the ill-will or good-will of the testator towards the legatee of any importance as evidence when his will is attacked in the courts as a forgery? Is it probable that he would bestow his bounty upon his enemies, whom he hates, in preference to his friends, whom he loves?

Upon authority, the evidence was admissible, and in reason and common sense appropriate and impressive.

Forgery is a secret crime, nearly always depending upon circumstantial evidence for its detection and punishment. Great latitude of proof is allowed, and every circumstance tending to elucidate the subject should be admitted in evidence.

This position does not conflict with the rule of Redfield, "that declarations are not admissible for the purpose of proving any abstract fact depending upon the force of the admission"; (1 Red. on Wills, 500;) and where the force of the evidence depends on the veracity of the testator in making such declaration. (Id., 505, 521.) If John Warren had said the will propounded was a forgery, and we had offered that declaration as evidence on the trial, the rule of Redfield—but not the law—would have excluded it; but we have not offered to prove any abstract fact by the declarations of the testator, the force of which depends on the veracity of the testator in making such declaration, but merely that, owing to his avowed hostility to the legatees, he probably would not have selected them as the subject of his bounty, to the exclusion of his mother and others nearer to him.

To a lawyer who has had the time and patience to read it through, the case of Boylan *v*. Meeker, 4 Dutch., 274, 478, quoted with so much confidence by Redfield, 556–559, is unsatisfactory.

BONNER, ASSOCIATE JUSTICE.—This is an appeal from the District Court of Leon county, in the matter of the contest of an instrument purporting to be the last will and testament of J. W. Warren, deceased. The probate was resisted by appellees, W. H. Brown and others, as the heirs at law of J. W. Warren, upon the ground that the will was a forgery. It was attested by D. E. Shumate and Noah Hallowell, as subscribing witnesses, who testified to its due execution as required by law.

There was a verdict and judgment against the validity of the will, from which W. M. Johnson and D. O. Warren, as executors named therein, the latter being also a beneficiary thereunder, prosecute this appeal.

We do not deem it necessary or advisable, in view of the judgment we shall render, to discuss all the alleged errors assigned, nor shall we dispose of them in the order assigned.

The facts in regard to the depositions of Robert Lacy are not sufficiently presented in the record so that we can advisedly pass upon this objection.

We are of opinion that the proposed testimony of D. O. Warren was not sufficiently material to the issue to authorize a reversal of the judgment because rejected by the court.

Some of the charges asked by the plaintiffs, Johnson and Warren, (as, that the testimony of one positive, unimpeached witness is entitled to more credit than many merely negative witnesses, and in directing the jury as to the rules which should govern them in discriminating between the witnesses,) were charges upon the weight of testimony, deductions of fact, and ordinary rules of reason, proper to be considered by the jury and legitimate in argument before them, but not rules of law to be obeyed by them, which would be embraced in a charge by the court. (Brown *v.* The State, 23 Tex., 200; Parrish *v.* The State, 45 Tex., 55; Sparks *v.* Dawson, 47 Tex., 147.)

We think the court properly refused the special charge asked, that the credibility of a witness is referable to the time of the act in question, and not to the time when he is called to testify.

If the witness Shumate, before the trial, made statements in regard to the execution of the will contradictory to those sworn to by him on the trial, it was not error to permit the witnesses Thomason and Burroughs to prove this, although Shumate may have then testified that he did not remember to have made them. Though formerly a disputed question, Mr. Phillipps thinks the better opinion is to admit the testimony, and this is the rule adopted by this court in Weir *v.* McGee, 25 Tex. Supp., 32.

The fact that the witness may have made the contradictory statements, and not his recollection of them, is the basis for their introduction to impeach him. The object of the preliminary examination is to give an opportunity for explanation. The testimony, however, was proper for the considera-

tion of the jury, not to prove affirmatively the matter in issue by his first statements, but negatively only, by discrediting his testimony; and the court, by appropriate instructions, should advise the jury of the purposes for which the testimony is admissible.

Neither was there error in the ruling of the court, under the circumstances as disclosed by the record, in permitting the contestants to introduce evidence of the general bad reputation of the witness Shumate for truth and veracity, after having first sought to impeach him by contradictory statements; the plaintiff having, in rebuttal of this, introduced evidence of his general good reputation.  Such questions must be left much to the discretion of the judge presiding, and are not subject to revision, except in a clear case of abuse of this discretion.  The court seems to have been quite liberal to both parties, as several impeaching and supporting witnesses were examined on each side, when it had the right to reasonably limit the number.  (Bunnell *v.* Butler, 23 Conn., 65, as cited in 1 Greenl. Ev., sec. 461, note 1.)

It was, however, in our opinion, error to permit testimony against the reputation of witness Shumate, based, as to impeaching witness Craig, upon a certain cotton transaction had between them, and, as to the other witnesses, upon public opinion growing out of the particular transaction then on trial before the court.  It is well established, that a witness can be impeached by evidence of his general reputation only, and not of particular facts; as he is presumed to be readily prepared to support the one, but not the other, without notice.  (1 Greenl. Ev., sec. 461; Boon *v.* Weathered, 23 Tex., 675.)

The whole policy of our administration of justice is to decide causes according to the law and the evidence, and, as far as possible, to guard against public or private influence, partiality, or prejudice.  The bias of a juror for or against a party is good cause of challenge; and the law is so guarded, that in felony cases jurors are placed in charge of a sworn officer, and not permitted to separate from him, even by con-

sent. To permit a subscribing witness to a will, the due execution of which is the very issue to be decided by the court, to be impeached by the verdict of the community, arising from that very transaction itself, is virtually to prejudge the case, and to transfer the trial from a sworn jury to the very uncertain and capricious tribunal of public sentiment. Although all due respect should be paid to an enlightened public opinion in matters proper to be decided by this test, yet to permit courts and juries to be influenced in their trials by outside sentiment, would be subversive of the great ends and purposes for which they were organized.

It does not appear from the record whether the ground upon which the general reputation was based, as testified to by the impeaching witnesses, was developed on the direct or cross examination. Mr. Justice Bell, in the elaborate case of Boon v. Weathered, 23 Tex., 686, adopts as the correct rule in such examinations, that the only proper questions to be put to the witness are those laid down in the formula of Mr. Swift, in his work on Evidence, as being less objectionable than any others to which his attention had been called. These are: Whether he knows the general character or reputation of the witness intended to be impeached in point of truth among his neighbors? If so, then what that character is, whether good or bad?

We think the proper practice should be, that, after the impeaching witness has, *prima facie*, thus first qualified himself to speak of the general reputation of the other witness, (this to be decided by the court,) then, before he answers the question as to what that reputation is, the opposite party, if he demands it, should have the right to cross-examine as to his means of knowledge; otherwise, if not qualified, and he has given his opinion, then, as said by the Supreme Court of North Carolina in The State v. Boswell, 2 Dev., (Law,) 212, it may be too late to correct the error, as the injury has been done, and an impression made on the minds of the jury

which neither the charge of the court nor the remarks of counsel can entirely remove.

By far the most difficult question in the case relates to the admissibility of the declarations of J. W. Warren, prior and subsequent to the date of the proposed will, tending to prove unfriendly feelings toward David and Henry Warren, two of the principal beneficiaries under the will. The subject to which this question belongs is one of very considerable importance, and has given rise to conflicting opinions.

The arguments in favor of the declarations of a testator, in disparagement of his will, may be summed up, in the language of Reel *v.* Reel, 1 Hawk., 248: "To reject the declarations of the only person having a vested interest, and who was interested to declare the truth, whose fiat gave existence to the will, and whose fiat could destroy, and in doing the one or the other could interfere with the rights of no one, involves almost an absurdity."

On the other hand, it is contended that such declarations are unlike those made against interest, which are evidence against the owner and those in privity with him, and unlike subsequent declarations of a vendor in disparagement of his title to property, made after he has parted with the same; that they are but hearsay; that although the testator had a vested interest, as the declarations do not affect the rights of any one, not even his own, he is not interested to declare the truth; that he is not a party to the contest; that neither the heirs nor the devisees are purchasers, but both are beneficiaries; that the fact that his fiat gave existence to the will does not prove that he may destroy it with a breath; that the statute requires he shall make his will in writing, and that he shall not revoke it by parol. (Boylan *v.* Meeker, 4 Dutcher, 283–289.)

That able and learned jurist, Judge Selden, in the elaborate and well-considered case of Waterman *v.* Whitney, 11 N. Y., (1 Kern.,) 160, reviews many of the cases on this subject, and groups them into the following three classes: 1. To

show a revocation of a will admitted to have been once valid. 2. To impeach the validity of a will for duress, or on account of some fraud or imposition practiced upon the testator, or for some other cause not involving his mental condition. 3. To show the mental incapacity of the testator, or that the will was procured by undue influence.

First, as to revocation. There seems to be no question that the mere declarations, unaccompanied with some unequivocal act of revocation, (as, burning, tearing, or cancellation,) will not amount to a revocation. Written instructions even to destroy the will are not, of themselves, sufficient. (Tynan v. Paschal, 27 Tex., 303.)

Second, to impeach the will for duress, &c. As to this class, it is held, by Judge Selden, that it is clear from the authorities that the declarations of the testator cannot be received, except such as were made at the time of the execution of the will and were strictly a part of the *res gestæ*.

Third, to show mental incapacity or undue influence. As to this class, the authorities generally seem to agree that the declarations of the testator, whether made within a reasonable time prior to the execution of the will or contemporaneously therewith, are admissible, since they are not intended as evidences of the testator for or against himself, but as facts by means of which the jury may be aided in their estimate of his free agency; as the sayings of a person of weak mind prove neither the truth nor falsity of what is thus spoken, but only his capacity. (Wigram on Wills, 284.)

In the above case of Waterman v. Whitney, 11 N. Y., 169, it is held, that subsequent declarations under this class should not be received, if so remote as not legitimately to bear upon the state of the testator's mind at the time the will was made, of which the court, in the exercise of a sound discretion, should judge. (Boylan v. Meeker, 4 Dutcher, 274.)

None of the cases to which we have referred, however, raise, from the facts of the particular case as reported, the precise point now before the court—the admissibility of the

declarations of the testator to invalidate a will upon the ground of forgery. But, as remarked in Griffin *v.* Stadler, 35 Tex., 706, they are generally cases which presuppose that there is no question or doubt as to the complete execution of the will. The authorities seem to be very few, in which declarations of a party are sought to be introduced to prove that a will purporting to be his, is a forgery. This arises, doubtless, from the very nature of the case, as a will, being an instrument to take effect after death, would, if forged, rarely, if ever, come to the knowledge of the one who purports to be the testator.

After full consideration of the question in this case, we are of opinion that the declarations of J. W. Warren, before and after the date of the proposed will, expressive of feelings of ill-will toward the beneficiaries, as were his feelings of kindness toward them, were properly admitted in evidence,—not, of themselves, as proof sufficient to overcome the testimony of the subscribing witnesses, but as a circumstance, in a case of this character, proper for the consideration of the jury in connection with all the other facts and circumstances in evidence; that they are not so much declarations disparaging a duly executed will, as evidence of an independent collateral fact — the state of feeling between the parties — and which would, in some degree, tend to prove the issue before the court.

We are of opinion, however, that there was error in admitting, over the objections of the plaintiffs, evidence that J. W. Warren attempted, just before his death, to make a will, which was left unfinished by reason of his death. This was not inconsistent with the assumption that he had made the one in question. There was no evidence that he had any knowledge of a forged will, and hence it cannot be presumed to have been intended as a revocation or substitute. If he had made no will at all, David and Henry Warren, not being his heirs at law, would not have taken his property by descent.

We cannot see that, in any point of view, this testimony

tended to prove the issue before the court. The case seems to have been hotly contested and public opinion excited. Under the circumstances, it may have had an undue influence with the jury. It was, therefore, irrelevant and improper, and should have been excluded.

For the above errors, the judgment is reversed and the cause remanded.

REVERSED AND REMANDED.