## TEXAS PIPE LINE CO. v. HIGGS.*
### (No. 9806.)

(Court of Civil Appeals of Texas. Fort Worth. April 15, 1922. Rehearing Denied May 27, 1922.)

**1. Witnesses ⬡⇒388(5) — Evidence admitted not proper predicate for impeachment of witness.**

In an action against a pipe line company for damages to plaintiff's farm occasioned from overflow of water, which was alleged as resulting from the negligent manner of constructing the line across plaintiff's land, where defendant's witness was cross-examined as to matters that did not contradict anything in his examination in chief, and where he had not testified in direct examination to anything in contradiction of testimony introduced to impeach him, there was no sufficient predicate laid for the introduction of impeaching testimony.

**2. Witnesses ⬡⇒321, 330(1)—Witness examined by one party and later recalled by adversary becomes adversary's witness with respect to new matter brought out.**

Where a witness is examined by one party and later recalled by the adversary, he becomes the witness of the adversary recalling him with respect to new matter brought out by the adversary, and no impeachment with respect thereto is permissible; and, as to entirely new matter brought out on cross-examination, the cross-examining party makes the witness his own as to such new matter.

**3. Appeal and error ⬡⇒1048(7) — Admitting evidence of impeaching witness reversible error.**

In an action against a pipe line company for injury to land caused by the negligent construction of the lines across plaintiff's land, where defendant's witness was cross-examined as to matters not within his scope to bind the company by admissions, and impeaching testimony was admitted to contradict the witness on matters in which he became the witness of the impeaching party, notwithstanding an instruction that the jury consider it only as impeaching the witness it was reversible error.

**4. Waters and water courses ⬡⇒179(5) — Damages to land from overflow on account of pipe line company's ditches should be submitted as on whole tract.**

In an action against a pipe line company for injury occasioned by overflow of water from the heavy rainfall, which the owner alleged resulted from the negligent manner in which defendant constructed its lines across his land, notwithstanding that the lines divided the tract into several parcels, the issue of damages to plaintiff's entire tract should be submitted as a whole.

Buck, J., dissenting in part.

Appeal from District Court, Wise County; F. O. McKinsey, Judge.

Action by W. F. Higgs against the Texas Pipe Line Company. From judgment for plaintiff, defendant appeals. Reversed and remanded.

McMurray & Gettys, of Decatur, for appellant.

J. A. Templeton, of Fort Worth, for appellee.

DUNKLIN, J. The Texas Pipe Line Company has appealed from a judgment rendered against it in favor of W. F. Higgs for damages to his farm, occasioned by overflow of water from a heavy rainfall, and which the owner alleged resulted from the negligent manner in which the defendant constructed its pipe line across the land.

The surface of the land was rolling, and plaintiff had constructed terraces and drain ditches across his field in order to prevent washing of the soil from heavy rainfalls. The public road ran on two sides of the farm, and on each side of the road there were drain ditches which diverted the flow of water from the field. Plaintiff, for a cash consideration paid him, had sold and conveyed to the Texas Company a right of way across the land for the construction and maintenance of a pipe line for the transportation of oil, and that right of way was duly assigned and transferred by the Texas Company to the defendant company. Employés of the defendant company dug a trench two or three feet deep and about two or three feet wide across plaintiff's land and across the public road in entering the premises. The pipe line was laid in that trench. A short time after the trench was dug, and before the pipe was laid, a heavy rain fell, the water from which overflowed and washed the most valuable part of the farm, thereby damaging it badly. It was alleged in plaintiff's petition that the value of the land so overflowed was practically destroyed, and that by reason thereof the remainder of the tract was greatly depreciated in value. It was further alleged that when the trench for the pipe line was dug defendant's employés who dug it piled the

---

⬡⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error refused October 11, 1922.

dirt from the excavation into the drain ditches which had theretofore protected his land from overflow, and had thereby so obstructed the natural flow of water accumulating in them as to cause it to overflow plaintiff's land; also that they had cut openings in the terraces which plaintiff had erected across his land to protect it from overflow, and these openings had also contributed to cause the overflow complained of. Such obstruction of the drainage ditches and the act of cutting and leaving open the gaps in the terraces were alleged to be negligent acts which were the proximate cause of the alleged injury to the land, and for which damages were sought.

After the first rain fell and the overflow had occurred, defendant permitted its pipe, which had been placed alongside the trench ready to be laid therein, to remain in that position with the trench open for some 25 days. In his petition plaintiff charged that the open ditch and pipe on the surface of the ground obstructed his access to some portions of the land, and that defendant's acts in so causing such obstruction amounted to negligence by reason of which plaintiff sustained further damages, the character of which was specially alleged.

The trial was before a jury, who allowed damages for depreciation in value of plaintiff's land, but did not allow the other special damages pleaded.

[1] John R. Furr was the defendant's foreman, in charge of the work of digging the ditch and laying the pipe line therein, and had the superintendency of the men employed to do the work. He was introduced as a witness for the defendant, and testified that the employés under his immediate supervision and direction dug a part of the trench for the pipe line, and that another gang of men working under the immediate supervision of a man by the name of D. T. McIntosh, and known as the tong gang, did the remainder of the work of digging the ditch, Furr not being present at the time. Furr testified that about 30 days after the time he with his men dug a part of the trench he came back and superintended the laying of the pipe line in the trench. While Furr was on the witness stand, and after he had testified in behalf of the defendant, and during his cross-examination by counsel for plaintiff, he was asked the following question:

"When you came back the 11th of April and was lowering the line in the ditch, didn't you have a conversation with Mr. Martin in which you told him in Mr. Higgs' field there that Mr. Higgs had been damaged and his place ruined, and if you had been along it would not have happened?"

Counsel for defendant objected to this question "because not within the province of an employé of this kind to bind the company with any such conclusion, highly preju-

dicial, improper, and incompetent." Whereupon the trial judge made the following ruling:

"I admit the testimony, not as a statement of fact, but only for the purpose of contradicting the witness, if you (the jury) believe he is contradicted."

Thereupon counsel for the defendant made the further objection that the question called for an answer that would not tend to contradict any statement of fact that the witness had made, but that it was sought by the question to elicit a conclusion from the witness and bind the defendant thereby, and that it was not within the scope of the authority of the witness as defendant's employé to bind it by any such conclusion. Thereupon the witness answered:

"No, sir; never said such a thing."

Over the same objection and ruling, the witness was further interrogated as follows:

"Now, at a point on the pipe line in Mr. Higgs' field, after the ditch had been dug and after the rains had come, before the pipe line had been laid, didn't you make this statement in the presence of Maud Martin and others in response to this question or conversation between you: Maud said something about the water going all over the ditches, and you replied that you hated the way the tong gang left the ditches and let the water in on him? Didn't you make that statement?"

To which the witness answered:
"No, sir."

Thereafter the witness Maud Martin was introduced by plaintiff, and the following question was propounded to him:

"I will ask you if on the pipe line in Mr. Higgs' field, after the ditch had been dug and after the rains had come and before the line had been buried, if John Furr, in your presence—you said something about the water going over the ditches, and Furr replied that he hated the way the tong gang left the ditch and let the water in on him. Did Furr make that statement?"

To that question the witness answered:
"Yes; he did."

The question and answer were objected to by the defendant's counsel to the effect that it was not competent as impeaching testimony for the reasons urged to the questions propounded to Furr in laying the predicate therefor, and that the admission of the statement so imputed to Furr was a like conclusion of the witness, and not a statement of fact, and that it was not within the scope of his authority as defendant's employé to bind it by such a statement. The court overruled that objection, and admitted the answer of the witness Maud Martin, but instructed the jury substantially to the same effect as he had already stated, to wit, that the testimony was admitted only

for the purpose of contradicting Furr as a witness if the jury should believe that it did contradict him.

During the cross-examination of John Furr by plaintiff's counsel, he was asked this further question:

"I will ask you if you did not make this statement in the presence of Mr. Cone, at his home, one night after the ditch had been dug, and after the rains had come, and before the pipe line had been buried—make this statement: That you would not have had them dig the ditch in Mr. Higgs' field at all if you could have helped yourself; that they had dug it before you got back off the right of way; that they had cut his ditches and let the water in and washed his field; that you would not have cut the hillside ditch until you got ready to lay the pipe, then you would have cut the ditch, laid the pipe, and fixed the levy?"

To which the witness answered:

"No, sir; I did not, nor substantially that statement."

Thereafter J. M. Cone was placed on the witness stand by the plaintiff, and this question was propounded to him:

"I will ask you if at your home one night, at night, after the ditch had been dug, after the rains and before the pipe had been buried, if John Furr made this statement to you: That they had dug the ditch in Mr. Higgs' field before he got back off the right of way, and that they cut his ditches and let the water in the field and washed his field?"

To which the witness answered:

"Yes; he made that statement."

To the question so propounded to Furr on cross-examination, and his answer thereto, and to the question so propounded to the witness Cone, and his answer thereto, the defendant urged substantially the same objections as were urged to the questions and answers noted above, and the court overruled those objections, and admitted the testimony, but told the jury that the testimony was admitted for the purpose of impeachment only, if the jury believed it would have that effect.

During the further cross-examination of the witness Furr he was asked the following question:

"Didn't you have a conversation with J. J. Moore, when you came back in April and was laying this pipe line in Mr. Higgs' field, up here at the point 'O' as indicated on the map, or to Mr. Higgs, Mr. Martin being present, in which you told Mr. Moore that Mr. Higgs' farm had been greatly damaged and washed by reason of the manner in which the pipe line had been constructed across the place, and if you had been along it would not have occurred?"

To which the witness answered:

"No, sir; never said such a thing."

The same objections and rulings were made to that question and answer, although it does not appear that the J. J. Moore referred to in the question was ever interrogated relative to the statement by Furr referred to in the question. But the question and answer of the witness Furr were objected to on the same grounds as those urged to other questions already noted, and the trial judge made the same rulings and gave the same instruction to the jury relative to the effect that the testimony was admitted for the purpose of impeachment only. The trial court also in his written charge further instructed the jury explicitly, as he had already orally instructed them, that the testimony complained of and referred to above was admitted for the sole purpose of discrediting the testimony of the witness Furr if the jury should believe that it would tend to impeach him.

Error has been assigned to those rulings, and we have reached the conclusion that those assignments should be sustained. Appellee insists that the testimony referred to was properly admitted for the purpose of contradicting testimony already given by Furr. A good deal of Furr's testimony is set out in appellee's brief in order to sustain that contention. We have carefully examined the testimony so relied on, but fail to understand how it can be said that it furnished a proper predicate for the impeaching testimony. It consisted of the statements to the effect that he (Furr) had dug the ditch a part of the way, and that the tong gang, under McIntosh, had dug the rest of it; also that the work so done by him was done first, and that McIntosh followed with his tong gang; he (Furr) did not return to the land again until the 11th or 12th of April, at which time the pipe was still lying on the surface of the ground, and had not been placed in the trench; also that he found that the ditch that had been dug by McIntosh had been filled up with water and mud level to the top, and a couple of holes washed through it. On cross-examination by plaintiff the following question was propounded to witness:

"It was washed pretty bad, to be perfectly honest, wasn't it? Answer: I didn't look at that; I just kept my eyes on my work."

The statements so made by Furr to the effect that he did not look to see whether or not plaintiff's land had been badly washed by the overflow was negative only. It was not proof that the land was not washed, nor had it been brought out by the defendant. Furthermore, the impeaching testimony complained of was not only to the effect that the land had been badly washed and injured, but that it was due to the negligence of the tong gang, and the damage would not have occurred if the witness Furr had been present to prevent it. Clearly, it was not

within the scope of the authority of Furr as an employé to bind the defendant by those statements as admissions against interest. M. P. Ry. Co. v. Sherwood, Thompson & Co., 84 Tex. 126, 19 S. W. 455, 17 L. R. A. 643; Texas Central Ry v. Dumas (Tex. Civ. App.) 149 S. W. 543; City of Austin v. Forbis, 99 Tex. 234, 89 S. W. 405. And, since the witness had not testified to anything in contradiction of the testimony introduced to impeach him, there was no sufficient predicate laid for the introduction of such impeaching testimony, and especially since the impeaching testimony involved opinions and conclusions, in the nature of admissions of liability on the part of defendant, as well as statements of facts. Texas Co. v. Strange (Tex. Civ. App.) 154 S. W. 327; G., C. & S. F. Ry. Co. v Southwick (Tex. Civ. App.) 30 S. W. 592; Saunders v. C. & S. F. Ry., 99 Tenn. 130, 41 S. W. 1032; F. W. & D. C. Ry. v. Thompson, 75 Tex. 501, 12 S. W. 742; 1 Greenleaf on Evidence, § 449.

[2] In 28 R. C. L. p. 465, the following is said:

"Where a witness is examined by one party and later recalled by the other, he is of course the witness of the party recalling him with respect to new matter brought out by such party, and no impeachment with respect thereto is permissible. * * * As to entirely new matter brought out on cross-examination, the cross-examining party makes the witness his own as to such new matter, and the rules already discussed govern as to the right of the party to contradict him."

See, also, Mattice v. Allen, 33 Barb. (N. Y.) 543; 40 Cyc. p. 693; Shackelford v. State (Tex. Cr. App.) 27 S. W. 8; 82 Am. St. Rep. 62, note.

[3] We are unable to concur in the contention made by the appellee that the error in admitting the testimony referred to was harmless, at all events, and that therefore the judgment of the trial court should not be disturbed. The instruction of the court when the testimony was admitted that the jury might consider it as impeaching testimony was reasonably calculated to induce the jury to believe that the court was of the opinion that it might have that effect. Since the testimony was inadmissible, and was calculated to materially affect the defendant's rights, we cannot say that the error in admitting it was harmless; and for that reason the judgment must be reversed, and the cause remanded. Weisner v. M., K. & T. Ry. Co. (Tex. Com. App.) 207 S. W. 904; Peden Iron & Steel Works v. Jaimes (Tex. Com. App.) 208 S. W. 898.

[4] The plaintiff's tract of land consisted of 101 acres. Two portions of about six acres each were separated by the defendant's right of way, and the jury allowed damages in the sum of $45 per acre for a portion of those two tracts, and $27.93½ per acre for the remainder. The remaining 90½

acres were not washed by the overflow, but the jury allowed damages in the sum of $7.50 per acre to that portion by reason of the injury done to the other portions which were washed; the total damage allowed by the jury being $1,100. That verdict was in response to the court's general charge, and in the charge the jury were instructed as follows:

"If, under the evidence and the instructions given you by the court, you find that two 6-acre tracts, or any part of said two tracts, of plaintiff's land were overflowed and washed, and thereby injured and depreciated in value, and that the defendant is liable therefor, you will find for plaintiff, and assess his damages at the difference between the cash market value of said two tracts of the land so directly washed and injured, if it was washed and injured, immediately before and what it was immediately after the injury thereto, not taking into account any damage or injury thereto, if any, not caused by the defendant.

"If you find that the defendant is liable for the overflow and washing of parts of plaintiff's land, as charged by plaintiff, and under the instructions given you by the court, and that thereby portions of his land were overflowed and washed in ditches, and denuded of soil, and thereby rendered unsightly, and that thereby plaintiff's other land, not overflowed and washed, was rendered less valuable, you will find for the plaintiff damages to such land other than the two 6-acre tracts aforesaid, and assess the same at the difference, if any, between the cash market value of said other land immediately before and immediately after such injury, not charging against the defendants damages, if any, that were not proximately caused by the acts of the defendant's employés, as complained of by plaintiff."

Different assignments of error are presented to those and other paragraphs of the charge. One of the criticisms is that, since no part of plaintiff's land was actually taken, the damages should have been estimated upon the entire tract considered as a whole. In 17 Corpus Juris, p. 884, the following is said relative to condemnation proceedings:

"Unless circumstances render a division necessary, the logical and proper method of computing damages for injuries to a part of land is to treat the estate as a whole."

And in 20 Corpus Juris, p. 738, it is said:

"The facts, however, that part of the land is river bottom and part upland, and that different parts of it might be most advantageously used for different purposes, do not preclude its being regarded as one tract, if the owner has treated the land as an entirety and has not contemplated any division."

In the same work, page 799, it is said:

"Where the land taken contains minerals, the measure of compensation is the market value of the land with the minerals in it, and the value of the minerals cannot be shown separately."

In the case of Texas & St. Louis R. R. Co. v. Matthews, 60 Tex. 215, land was taken by a railway company without resort to the statutory condemnation proceedings. It was held that the railway company was a trespasser, but the court, after referring to the statutory method of fixing the damages in case of the regular condemnation proceedings under the statutes, had this to say:

"The compensation as fixed by the statute referred to should, by analogy, be applied to such a case, and the plaintiff should recover the amount of the value of the land appropriated on the day it was taken, this amount to be increased or diminished accordingly as the remainder of the tract has been injured or benefited by the appropriation of a portion of it for the construction of a railroad. * * * This is the rule which should determine the amount of the plaintiff's recovery in this case, if he recovers at all, provided he makes no proof of special damages, or lays a basis for such as are exemplary. In estimating the value of his property, no separate account should be taken of the trees cut from the land, but the value of the land taken with the trees growing on it should be assessed. They are part of the realty and should not be separated from it in arriving at the value of the land."

Articles 6518 to 6521, inclusive, V. S. Tex. Civ. Statutes, prescribe the rules for measuring the damage done to land across which a railway right of way is condemned under statutory proceedings. Article 6520 reads:

"When only a portion of a person's real estate is condemned, the commissioners shall estimate the injuries sustained and the benefits received thereby by the owner as to the remaining portion of such real estate; whether such remaining portion is increased or diminished in value by such condemnation, and the extent of such increase or diminution, and shall assess the damages accordingly."

Plaintiff alleged that the work so done by the defendant was performed in a negligent manner, and that the damage to his land was the result of such negligence. Since the judgment of the trial court is to be reversed for the errors pointed out above, we shall not undertake to decide whether or not the action of the court in separating plaintiff's land into three different tracts and submitting issues of damages to those tracts separately was such error, if error at all, as would of itself require a reversal of the judgment, but we suggest that upon another trial we think it better to submit the issue of damages to plaintiff's entire tract as a whole. Plaintiff lived on the tract as his homestead and used it as such in its entirety. Nothing in the evidence suggests any sufficient reason for dividing it up into separate tracts for the purpose of assessing damages. Indeed, it seems from the evidence that each tract is more valuable by reason of its being a part of the whole. There is nothing in the evidence to indicate that either of the two 6-acre tracts could be

sold on the market to advantage to any one who did not own the remainder of the tract, and to so divide the tract and assess plaintiff's damages upon the basis of the market value of the several parts considered singly and separately and apart from the other tracts, and as though they were being offered on the market to purchasers generally, would be unfair to the plaintiff. However, we are of the opinion that there is no merit in another assignment to the action of the court in admitting testimony to show the amount of injury done to the two six-acre tracts based upon the estimates of the witnesses of the values of those two tracts. Such testimony could be properly considered by the jury in estimating the damages to the entire tract considered as a whole.

As pointed out above, the defendant had already acquired and paid for the right to construct its pipe line across plaintiff's land. The compensation received by the plaintiff for that right of way included compensation for such damages to his land as would necessarily result from the construction of the pipe line with ordinary care. Such care would be that degree of care which a person of ordinary prudence would exercise to avoid unnecessary injury to plaintiff's land by the construction work, and the defendant was not liable to the plaintiff for any damages which did not result from a failure to use such ordinary care. In other words, the defendant was not liable to the plaintiff for any damages which would necessarily have resulted from the construction of the pipe line in a proper manner. Upon another trial that distinction should be made in the court's charge to the jury to the end that damages be not assessed for injuries which necessarily would have resulted from the construction of the pipe line with ordinary care. The charge given is criticized as warranting the jury in assessing damages for all injuries resulting from the construction of the pipe line, irrespective of the question whether or not the same resulted from a want of ordinary care on the part of the defendant's servants. It will be unnecessary to determine the merits of those criticisms, since they can be easily avoided upon another trial.

For the errors indicated, the judgment is reversed, and the cause is remanded.

BUCK, J. (dissenting). I cannot concur in the reversal of this judgment on the ground that the trial court erred in permitting impeaching testimony to contradict the witness Furr in his statement that "I did not look at that; I just kept my eyes on the work." Plaintiff had the right to ask Furr, his adversary's witness, if the ground was not pretty badly washed. Furr's answer was to the effect that he did not know. This was an important matter, involving the question of the amount of damages to which plaintiff was entitled. Thereupon, in the view of the

writer, it was permissible to introduce proof that Furr upon another occasion had stated that the ground was pretty badly washed and damaged by the flood. Nor do I think that the fact that the testimony upon which the impeachment was predicated was brought out on cross-examination, or was negative in its character, in any way affects the rule here stated. Craft v. State (Tex. Cr. App.) 31 S. W. 367, 368; Johnson v. Brown, 51 Tex. 65, 75; Edwards v. Osman, 84 Tex. 656, 659, 19 S. W. 868; Shoemaker v. State, 58 Tex. Cr. R. 518, 126 S. W. 887; Weir v. McGee, 25 Tex. Supp. 21, and other cases cited in White's Code of Criminal Procedure, § 1116, subd. 2. If the impeaching testimony contained other matters injurious to defendant in addition to the fact that Furr had stated on a prior occasion that the field was pretty badly washed or damaged, an objection should have been urged to such extraneous matter, and not as to the impeaching testimony. In any trial one has the right by cross-examination, and even impeaching testimony, to test the good faith and integrity of an opposing witness. Ry. Co. v. Scurlock, 97 Tex. 305, 78 S. W. 490; Ry. Co. v. Dyer, 76 Tex. 156, 13 S. W. 377. Otherwise I concur in the conclusions reached by the majority.