### In re WILLIAMS' ESTATE.
### SMITH v. MABRY.
#### No. 3593.

Court of Civil Appeals of Texas. Beaumont.

Jan. 4, 1940.

Orgain, Carroll & Bell and John G. Tucker, all of Beaumont, and E. B. Pickett, Jr., and Bradford Pickett, both of Liberty, for appellant.

LeRoy McCall, of Beaumont, for appellee.

WALKER, Chief Justice.

This action was instituted by Walter Mabry, beneficiary, to probate a certain instrument in writing as the last will and testament of Pearl Robichaux Williams, deceased, executed by her by her mark on the 11th day of February, 1936, and witnessed by Henry Cooper and Lorena Thompson. The instrument was testamentary in its character, and was executed under the due formalities of law. By the terms of the instrument, the deceased de-

vised to appellee, Walter Mabry, who was her uncle, a certain tract of land in Liberty county containing 26.7 acres of land. The probate of the will was contested by appellant, Calvin Smith, the father of the testatrix. On trial in the district court of Jefferson county, on appeal from the county court, the issues made by the pleadings were submitted to the jury by the following questions:

(1) "Do you find from a preponderance of the evidence that the purported will introduced in evidence, same being a paper dated February 11, 1936, was signed by Pearl Robichaux Williams in the presence of Henry Cooper and Lorena Thompson?"

(2) "Do you find from a preponderance of the evidence that Pearl Robichaux Williams signed such instrument with the intention that the same should be her last will and testament?"

On the jury's affirmative answers to both issues, the instrument in writing was admitted to probate as the last will and testament of Pearl Robichaux Williams, deceased.

The evidence raised the issue that Pearl Robichaux Williams did not execute the instrument in issue "with the intention that the same should be her last will and testament." Lorena Thompson, one of the subscribing witnesses, testified that on the day the instrument in issue was executed she went to the home of the deceased on the invitation of appellee, that he asked her to go—that he wanted her "to go and sign a mortgage"; that the deceased was awfully sick that day; that she signed the instrument in issue. She gave the following additional testimony:

"Q. Who asked you to sign that? A. This fellow told me to put it there. * *

"Q. What fellow? A. This fellow, White.

"Q. Did he tell you what kind of paper you were signing or wanted you to sign? A. A mortgage. * * *

"Q. Did you see Henry Cooper sign that paper? A. I didn't see him sign his name, but I signed mine.

"Q. You signed yours? A. Yes, sir.

"Q. At any time while you were there did Henry Cooper or the lawyer, White, pass a paper over to Pearl Williams and have her sign it while they held her hand? A. No, sir.

"Q. How is that? A. No, sir; I didn't see it.

"Q. At any time while you were there did Walter Mabry or the lawyer, White, name any other kind of paper except a mortgage? A. No, sir; a mortgage.

"Q. When you got over there was Henry Cooper already in the room? A. Yes, sir.

"Q. Did you know Henry Cooper before that time? A. Yes, sir.

"Q. While you were there at any time did anybody read a paper over to Pearl Williams and tell it was a will? A. No, sir. I haven't heard nor I haven't saw it. * * *

"Q. You said that Mabry told you he wanted you to sign what? A mortgage? A. Yes, sir: that is what it was, a mortgage.

"Q. Is that what it was? Do you know a mortgage when you see one? A. A mortgage. I know what it means; yes, sir.

"Q. How did you know that was a mortgage? A. Because they called me to sign to a mortgage.

"Q. Who told you it was a mortgage? A. I understood it was a mortgage, because when they called me that is what they called me to sign to, a mortgage.

"Q. Isn't it true he told you he wanted you to come over and witness a will? A. No, sir."

Emma Wilfrey, the grandmother of the deceased and the mother of appellant and appellee, moved into the home of the deceased and lived with her about eight months prior to her death, and was present in the room when the instrument in issue was executed. She testified that she was there when "White, a colored lawyer, came to the house where Pearl lived," and that appellee came with White, that she asked appellee "what is all this?" and he replied, "It ain't nothing but just a little mortgage." "I asked him what was all of this, because I seen this other man was there, and he said, 'it ain't nothing more than a little mortgage that I am making to get Dr. Miller his money.'"; Dr. Miller was Pearl's physician.

"A. I didn't hear no will. She said it was a mortgage. That is what she told

me, it was a mortgage, and he told me the same thing, because they are all my children and I love them all, but he told me it was just a mortgage until he could get money.

"Q. Who told you that? A. My son, Walter Mabry, my son told me that.

"Mr. McCall: We object to that.

"The Court: Objection sustained.

"Q. Was it there in the presence of Pearl at the time? A. Yes, sir.

"Q. Did she hear what he said? A. Yes, because she asked me about it and said, 'What is a mortgage?' I said, 'Just to collect the money.'

"The Court: Wait a minute. Judge Pickett asked you about what was said when Walter and your daughter were both there.

"A. That is what I am trying to say. I tried to go on, but when you hush me up, I can't talk.

"The Court: Just tell what was said there?

"A. That is what he said, it wasn't no will at all. He told me that.

"Q. When he said that, where was Pearl? A. She was laying in her bed.

"Q. Could she hear what he was saying? A. Yes, sir, she could hear him.

"Mr. McCall: We object to this, transaction happening several days before the will was executed.

"A. Wasn't no will.

"The Court: Objection overruled.

"Mr. McCall: Note our exception.

"Q. When you went to the trunk, did you find a deed? A. I looked in this end of it and she said to me, 'Look in the other end in a little pink rag.' Well, I looked in there and I got the rag and when I took the rag, he was standing over me, and he taken it and I don't know what he done with it, but he took it and the next day she handed it to me and told me it was in the bed there, he had brought it back. Now I did not pay so much attention to that, but she told me to take it and give it to her papa."

On cross-examination, Emma Wilfrey testified: "Three day before they come there, she (Pearl) said she didn't know if they were trying to fool her or not. That is what she said, but she said 'He is scared I won't pay him,' but she said, 'If I live to get up I am going to work, I work for rich white people, and I know they will lend me the money to pay him, and if they don't, my daddy will pay him if they give him time."

Appellant rests his appeal upon the errors assigned against the ruling of the court excluding certain testimony.

(1) The following letter, on the testimony of Alphonse Curtis, written by him at the request and under the direction of Pearl Williams:

"Beaumont, Tex.
"Feb. 17, 1936.

"Dear Father:

"Only a few lines to let you hear from me. I recd. your letter and glad to hear from you. Tell Mrs. Sousie I thank her very much for the dollar she sent me. But I taken sick very shortly after I got it, that it why I am late in ans. your letter, I was so sick and it is so hard to get any one to write for you.

"I have been real sick in bed it was two weeks ago last Sunday gone. I varmeted up almost a half gallon of blood the Sunday night I taken sick. Uncle Walter got the Dr. for that Monday.

"The Dr. Put me in bed and told me to stay in bed and be quiet as I can possible be.

"I am taking shots they cost Uncle Walter $5.00 a piece. Uncle Walter is the only one that is bareing my expense—and for secoity of his money, It is not a will but in case of my death I willed him the place.

"But if I get up I can pay him his money back or he can pay the difference and I can redeem the place back. If I die all you have to do is pay Uncle Walter the money I owe him and take the place back. It was the only thing I could do because I needed help and I had to give him some kind of secoity.

"Don't get frighten over what I am telling you. I know every one must die and I must die also. I want you to have that place at my death if you can pay Uncle Walter back you take the place.

"Dont put your self to any trouble to come to see me because Uncle Walter is doing all he can for me, even though it is straining him mighty hard. But you could not do any more for me if you were here.

"Not my folks—But strangers have really treated me loyal since I have been down.

"Love to all, your wife & Mrs. Lee.

"Answer soon
"Your Daughter,
"Pearley Williams
"120 Finnis St
"Beaumont, tex."

(2) Certain testimony relating to the delivery of this letter to Calvin Smith, and its custody subsequent to its delivery.

(3) Testimony of Emma Wilfrey, named above, quoting from the bill of exceptions: "That after Pearl Robichaux Williams died, certain money due as insurance from a lodge was paid to the said witness, Emma Wilfrey, the grandmother of deceased, and out of that money $5.00 was given to Walter Mabry by Emma Wilfrey as a repayment to him of that amount due him on account of the money he had loaned deceased to enable her to obtain medical attention."

## Opinion.

The instrument in issue, to operate as a will, must have been executed by Pearl Robichaux Williams with the intention that it operate as her last will and testament. On that point we quote from 68 C. J. 604: "Animus testandi is essential to a will, that being, indeed, its distinguishing feature, and the thing that makes an instrument a will. So, in order that a document may be operative as a will, it must have been intended when it was executed to operate as a will, or have been later adopted as such, except as instructions or memoranda for the preparation of a will may be given testamentary effect where an act of God prevents the completion of the instrument in regular form. The animus testandi does not depend, however, upon the maker's knowledge or realization that he is making a will, or upon his designation of the instrument as a will, or upon the time, place, and circumstances of its execution, but upon his intention to create a revocable disposition of his property to take effect at his death."

The general principles thus announced by Corpus Juris have full recognition in the jurisprudence of this state. Shiels v. Shiels, Tex.Civ.App., 109 S.W.2d 1112; Brackenridge v. Roberts, 114 Tex. 418, 267 S.W. 244, 270 S.W. 1001.

Appellee rested under the burden of proving that the instrument in issue was executed by Pearl Robichaux Williams with the intention that it should be her last will and testament. On this point, we quote the following proposition from 68 C.J. 984: "In accordance with the general rule as to the burden of proof in proceedings for the probate of a will, the burden is upon the proponent to prove that the instrument offered for probate was executed with intention that it would be the maker's last will and testament. It is ordinarily to be presumed, however, in the absence of any evidence to the contrary, that a duly executed instrument in form a will was executed animo testandi."

The court recognized the general principle that to be the last will and testament of Pearl Robichaux Williams it must have been executed by her as such, and that the burden rested upon appellee as the propondent of the will to establish that issue, by submitting to the jury special issue No. 2. The point at issue on this appeal is the admissibility of the testimony set out above, offered by appellant to establish the fact that in executing the instrument it was not the intention of Pearl Robichaux Williams that it should operate as her last will and testament.

Considering first appellant's third point: Appellee offered the instrument as the last will and testament of Pearl Robichaux Williams. The evidence raised the issue that, at the very time it was executed, it was the intent of the deceased in executing the instrument and of appellee as the named beneficiary that it should operate only as a mortgage. The deceased owed appellee money advanced by him for her use and benefit. The evidence raised the issue that when this debt was paid the instrument should not be effective. Clearly, it was admissible for appellant to show that, after the death of Pearl Robichaux Williams, appellee's mother tendered him and he accepted as a payment on his debt against the deceased the sum of $5 collected by the mother from insurance due because of Pearl's death.

Points 1 and 2 advanced by appellant present the point of the admissibility of declarations of deceased made after the execution of the instrument as to its nature and of her intention in executing it. The admissibility of declarations made be-

fore and subsequent to the execution of wills is a point of great difficulty. Under the jurisprudence of this state declarations of the testator made before and subsequent to the execution of the will are admissible on the issue of undue influence, Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138; on the issue of forgery, Johnson v. Brown, 51 Tex. 65; on the issue that the will had been revoked, McElroy v. Phink, 97 Tex. 147, 76 S.W. 753, 77 S.W. 1025. As we understand the reasoning of our Texas cases, such declarations are admissible on the theory that they tend to establish the mental state of the deceased at the time the will was executed, and that only such declarations are admissible "as tend to reveal it by being in themselves expressive of his mental state." Scott v. Townsend, supra [106 Tex. 322, 166 S.W. 1144]. In Wood v. Wood, 241 Ky. 506, 44 S.W.2d 539, 540, the court of appeals of Kentucky said: "Declarations of the alleged testator, before and after the supposed testamentary act, are competent in corroboration of other evidence of the main fact to which the declarations are addressed."

That the instrument in issue was not intended by the deceased to operate as her last will and testament was shown by testimony independent of that offered and excluded. The letter excluded by the court was written by the deceased within six days of the execution of the instrument; thus, it appears that the letter was written "within a period not too remote," and that the issue was independently raised —two conditions discussed and given controlling effect by our Supreme Court in Scott v. Townsend, supra.

■ Appellee had no vested interest under the instrument in issue; his right to probate the instrument rested upon the intention of the deceased in its execution. No one could speak with more authority on that issue than the deceased herself. Since under the Brackendridge and Shiels cases it is permissible to prove the intention, though it conflict with the language of the instrument, it is clear to our minds that the letter excluded by the court should have been received in evidence. We cite generally the following additional authorities, all in point and sustaining our conclusion: Atherton v. Gaslin, 194 Ky. 460, 239 S.W. 771; Clark v. Hugo, 130 Va. 99, 107 S.E. 730; Estate of Watkins, 116 Wash. 190, 198 P. 721, 17 A.L.R. 372; Holloway v. Parker, 197 Ark. 209, 122 S.W.2d 563, 119 A.L.R. 1359; Hoppe v. Byers, 60 Md. 381; Madden v. Sevier, 271 Ky. 688, 113 S.W.2d 41; Moos v. First State Bank, Tex.Civ. App., 60 S.W.2d 888, 891; Quick v. Quick, 3 Sw. & Tr. 442; Robinson v. Stuart, 73 Tex. 267, 270, 11 S.W. 275; Russell v. Tyler, 224 Ky. 511, 6 S.W.2d 707, 709; Tynan v. Paschal, 27 Tex. 286, 300, 84 Am. Dec. 619.

■ Appellee would support his judgment by the following proposition from 44 Tex.Jur. 751: "A will is within the inhibition of the general rule, forbidding the modification of a written instrument by parol evidence, accordingly it is settled that extrinsic or parol evidence be not admissible for the purpose of adding to, contradicting, or detracting from, or varying a will. The rule that excludes parol evidence must be adhered to even though it result in a partial or total failure of the testator's intended disposition."

And the same author, at page 686, said as follows: "Primarily the testator's intention is gathered from the terms of the will itself, that is, from the purport of the words or meaning of the terms used, and from these alone. If there is no ambiguity in the writing, the intention must be drawn from its language, unaffected by assumption or expression, based upon extraneous circumstances."

This authority is not in point. When an instrument is admitted to probate as a will it must be construed by the language used by the testator. The contest in this case was against the probate of the instrument as a will; its construction as written was not before the court.

■ The excluded testimony was in its nature cumulative, but its materiality cannot be questioned. This court cannot say that, had the jury been advised by appellee's mother that he received $5 as a payment on the debt owed him by the deceased or had the jury been permitted to weigh the letter written by the deceased to her father, it would not have returned a negative answer to question No. 2.

From what we have said, it follows that the judgment of the lower court should be reversed and the cause remanded for a new trial.

Reversed and remanded.